Judith CLARK, Petitioner,

v.

Ada PEREZ, Superintendent Bedford Hills and Eliot Spitzer, Attorney General, State of New York, Respondents.

No. 05 Civ. 698(SAS).

United States District Court, S.D. New York.

Sept. 21, 2006.

Leon Friedman, Sharon Grobman, New York, NY, Lawrence Lederman, Michael L. Hirschfeld, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Petitioner.

Eliot Spitzer, Attorney General for the State of New York, New York, NY, Michael E. Bongiorno, District Attorney of Rockland County, New City, NY, for Respondents.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

[W]here denial of the constitutional right to assistance of counsel is asserted, its peculiar sacredness demands that we scrupulously review the record.

— *Avery v. State of Alabama,* 308 U.S. 444, 447, 60 S.Ct. 321, 84 L.Ed. 377 (1940).

The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.'

— *Johnson v. Zerbst,* 304 U.S. 458, 462, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

## I. INTRODUCTION

Judith Clark seeks a writ of habeas corpus pursuant to section 2254 of Title 28 of the United States Code, challenging her state court convictions for three counts of Murder in the Second Degree,[1] six counts of Robbery in the First Degree,[2] and related lesser crimes. Clark is currently serving three consecutive indeterminate terms of imprisonment of twenty-five years to life on the murder charges, running concurrent to lesser terms on the robbery charges.

Clark asserts that the court's failure to insure that she was represented at trial amounted to a Sixth Amendment violation, and for the reasons fully discussed below I agree. Clark's situation is almost unprecedented—she vigorously sought to represent herself at trial, and yet was so unwilling to abide by courtroom protocol that she remained in a cell, outside the courtroom, for the entire presentation of the prosecution's case.[3] Because Clark was never appointed standby counsel, there was *no one* in the courtroom to represent her interests during this critical phase of the trial.

 This case is not about waiving the right to counsel—Clark did knowingly and intelligently waive this right. But "there are limits to waiver . . . some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept."[4] In the context of the Sixth Amendment right to counsel, a knowing waiver does not end the inquiry because a court must next determine that a defendant is "able *and willing* to abide by rules of procedure and courtroom protocol" in order for pro se status to be properly granted.[5] Indeed, even where self-representation is properly allowed, a court must terminate pro se status if a defendant subsequently demonstrates that she is unwilling to meet these requirements. Whether pro se status is deemed impermissible at the outset of or during a criminal trial, counsel must be appointed so that a defendant is not left without any representation at all. This rule derives not only from a defendant's Sixth Amendment right but from the judiciary's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."[6]

## II. BACKGROUND [7]

### A. The Offense Conduct

Judith Clark is a former radical and member of the "Weather Underground" who, with four other individuals, was charged with participating in a 1981 Brinks armored truck robbery in Nyack, New York. A Brinks guard named Peter Paige and two policemen, Officer Waverly

---

1. *See* N.Y. Penal Law § 125.25(1).

2. *See id.* § 160.15(4).

3. As described in detail below, Clark was able to hear the proceedings through a one-way speaker in the holding cell, and would have been permitted to return to the courtroom upon her request.

4. *United States v. Josefik,* 753 F.2d 585, 588 (7th Cir.1985) (cited in *United States v. Mezzanatto,* 513 U.S. 196, 204, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995)).

5. *McKaskle v. Wiggins,* 465 U.S. 168, 173, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (emphasis added).

6. *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

7. The following facts are drawn from the parties' submissions and are undisputed unless otherwise noted.

Brown and Sergeant Edward O'Grady, were killed during the robbery, and other persons were injured by gunfire. Clark was the driver of a getaway vehicle.[8]

## B. Pretrial Proceedings

By Rockland County Indictment Number 81–825, Clark and four others were charged with three counts of second degree murder, six counts of first degree robbery, and several lesser counts of assault and larceny. In November, 1982, a motion for a change of venue filed by one of Clark's co-defendants was granted, and the entire case was removed to Orange County.[9] During the arraignment and initial pretrial proceedings, Clark was represented by Susan Tipograph. Clark and her co-defendants David Gilbert and Kuwassi Balagoon then applied to forego representation by counsel and proceed pro se.

During pretrial proceedings on June 2, 1983, when Orange County Court Justice David S. Ritter was to rule on this application, the three defendants refused to be seated because they claimed "[t]he issue prior to that is [that] the police in this courthouse beat people up."[10] Specifically, defendants alleged that a man "was singled out as a Black activist and the goons went and clubbed him for sitting down."[11] Defendants continuously interrupted and defied Justice Ritter, and eventually he asked to have Gilbert removed.

Clark said: "We will go ourselves . . . We will not proceed under these conditions . . . This is a freedom fight. We are freedom fighters."[12] Tipograph and the other counsel also "rose and walked out and left the courtroom without [the court's] permission."[13] Justice Ritter commented: "I have not excused them and their attendance is required since they are lawyers in the case who have not yet been released."[14] He also noted for the record:

> My efforts to conduct the questioning required by law of a defendant so that he can make a determination as to whether the waiver of counsel proposed is a knowing and intelligent waiver conducted and sought in recognition of the dangers that attend pro se representation have been frustrated by the refusal of the defendants to conform to the most rudimentary rules of order so that I could elicit the information required in order to make a ruling.[15]

When proceedings resumed that afternoon, the court noted Tipograph's continued failure to return to the courtroom.[16] Then, the three defendants returned to the courtroom voluntarily some minutes later, and Justice Ritter warned them: "If you are to remain in this courtroom, you will do so only if you agree that you will conduct yourself in a nondisruptive fashion in conformity with basic rules of decorum

---

8. Clark was not accused of being one of the shooters. *See People v. Brown*, 136 A.D.2d 1, 525 N.Y.S.2d 618, 620 (2d Dep't 1988) (the shooters were "as many as six armed men").

9. *See People v. Boudin*, 90 A.D.2d 253, 457 N.Y.S.2d 302, 307 (2d Dep't 1982).

10. 6/2/83 Transcript of Pretrial Proceedings ("6/2/83 Tr."), Ex. C to Affirmation of Ann C. Sullivan, Counsel to Respondents, in Opposition to Motion to Vacate Pursuant to CPL § 440.10 ("Sullivan Aff."), Ex. D to 5/7/06 Opposing Declaration, at 4.

11. *Id.* at 8.

12. *Id.* at 9.

13. *Id.* at 10–11.

14. *Id.* at 11.

15. *Id.*

16. *See id.* at 13–14, 23–24.

that apply in this courtroom." [17] Clark contested that she had been disruptive and asserted: "My purpose to be here at all was to fight for my right to represent myself because I am a freedom fighter . . . because I am the only one who can speak for myself and I have things to say for myself." [18]

Addressing Balagoon first, but directing his instruction to Clark and Gilbert as well, Justice Ritter stated:

> Now, you appear before me today because you seek to represent yourself in this case and the law requires that before I rule, that I must first determine whether your request is unequivocal and whether your offer to give up your right to be represented by a lawyer is knowingly and intelligently made. If you satisfy both of those conditions, I will permit you to represent yourself. My decision will be made after I ask you a series of questions and will rely on the answers that you give in deciding whether your request to represent yourself is a knowing, intelligent and unequivocal choice. If anyone says anything in the course of this proceeding that you don't understand, call that fact to my attention and I will not go on until you understand exactly what is happening.[19]

After ascertaining Balagoon's capacity to proceed pro se, the court addressed the legal right of a person to defend himself:

> The law recognizes the right of a person to defend himself, but the law also recognizes that such a choice may not be a wise one. Let me alert you to some of the dangers of self-representation so that you will be aware of those dangers before you finally decide whether you wish to give up your right to be represented by a lawyer.
>
> Even the intelligent and educated layman has small and sometimes no skill in the science of law. Left without the assistance of counsel, he may be put on trial without a proper charge and convicted upon incomplete, irrelevant, or inadmissible evidence. Often the layman lacks the skill and knowledge adequately to prepare his defense, even though he may have a perfect one. Most layman require the guiding hand of counsel at every step in the proceedings against them. The right to be heard would be in many cases of little avail if it did not include the right to be heard by counsel. Without counsel, though an accused be not guilty, he faces the danger of conviction because he does not know how to protect his rights.
>
> Lawyers generally, as I am sure you know, are both college and law school trained before they are permitted to take the bar examination. Only those who pass the exam are licensed to practice law and the number who become trial lawyers is small. In order to adequately represent a client, a trial lawyer needs a comprehensive knowledge of the rules of evidence as well as an understanding of the art of jury selection and the art of cross-examination. Most non-lawyers do not have such education or training.
>
> In view of the length and complexity of this case, sir, I consider it unwise for any defendant to represent himself. Despite this, I am required to permit you to represent yourself, if your choice is a knowing and intelligent one, made with awareness of the dangers of waiving counsel.

17. *Id.* at 26.

18. *Id.*

19. *Id.* at 32–33.

You should also be aware of the fact that if you are permitted to represent yourself, you will not receive any special favors. Rather, you will be subject to the same rules as a lawyer. Special rules are not made for those who choose to represent yourself nor can the judge become a legal advisor to the self-represented defendant. The judge's role is to remain neutral and detached.

You should also be aware that self-representation is not a license to abuse the dignity and decorum of the courtroom. The person who represents himself must conduct himself as with any lawyer in the case. If a defendant conducts himself in such a way that the fair and orderly presentation of the issues during the trial is prevented or the progress of the trial is undermined, upset or unreasonably delayed, then the court may remove the defendant from the courtroom. If that occurs, do you understand that during the period of such removal the defendant who is representing himself will not be represented by anyone, thus, he has waived both the right to be present at his trial and the right to represent himself or be represented by counsel[?] Do you understand the significance of what I've just said? [20]

As the court turned to address Clark, Clark advised Justice Ritter that she had "absolutely" heard and understood what had been said.[21] Clark confirmed that she suffered from no physical or mental impairments to prevent her from understanding the proceedings.[22] She told the court she had sufficient time to reflect on her decision to proceed pro se: "I stated my demand to be able to represent myself and in fact fired my lawyer on September 13th of last year and I have fought to represent myself as a freedom fighter ever since. That is plenty of sufficient time." [23]

Clark informed the court that she "went through her first year of college and then [she] was expelled for demonstrations." [24] Subsequently, she worked at assorted jobs, including at the pre-sentence division of the Legal Aid Society, where she worked "in the courts and social agencies." [25] Clark also said:

> I have been involved with the question of the courts and the questions of legality rather intimately, not so much as a paid worker, but I have been involved in support of political prisoners and prisoners of war ... the main thing that I could say from that experience is learning that this court system and the trappings of legality that it has created around the court system are a cover for being part of the maintenance of this system and being part of protecting property and those who own and control that property ... and I think that my years and years of experience with the courts is part of what helped me understand why the only solution was revolution.[26]

Clark confirmed she was "not at all" dissatisfied with the services of Tipograph, but nonetheless chose to proceed by self-representation: "I wish to represent myself because as a freedom fighter I am the only one who can speak for myself and I can definitely not be represented by an

20. *Id.* at 40–42.

21. *Id.* at 58.

22. *See id.*

23. *Id.*

24. *Id.* at 59.

25. *Id.* at 60.

26. *Id.* at 61–62.

officer of the court."[27] When the court questioned Tipograph about whether Clark was "capable of representing herself and whether she was competent to make this very serious decision," Tipograph stated that she had "absolutely no question about her competency and intelligence to make this decision."[28]

Justice Ritter concluded the inquiry by repeating a warning for the third time that afternoon: "You are aware that if I grant your application and I am disposed to do so, that if there comes a time where I am required as I see fit by reason of your conduct to remove you from the courtroom, you will at that juncture be unrepresented. Are you aware of the significance?"[29] Clark stated "I am perfectly aware and I would like to make clear that I left voluntarily this morning ... because it would have been an abrogation of our principles to continue as though everything was just alright."[30]

The court concluded by addressing the portion of Clark's application that requested permission for her attorney, Susan Tipograph, to remain as her "legal advisor," making Tipograph available for consultation but not to appear and speak on Clark's behalf. Justice Ritter noted that Tipograph would be involved in the ongoing federal prosecution that would last for "some months to come."[31] He told Clark: "My intention is to commence trial of this case on July the 11th. I alert you before you finally take a position that in my judg-ment there is no warrant ... to delay the commencement of the state prosecution to await the availability of Miss Tipograph to serve in the capacity of your legal advisor, whatever that means."[32] Justice Ritter concluded, "Being aware of that, do you nevertheless wish to press your application to proceed pro se?"[33] Clark answered: "Absolutely."[34] At this juncture, the court granted Clark's request to proceed by self-representation.[35] Later on the same day, Clark said:

> I have one other issue ... which is just perhaps you will say it is a question that has to be addressed about how we deal with the trial. I just want to make my position clear ... We consider ourselves freedom fighters, and we do not believe that the question at hand in this situation has anything to do with guilt or innocence or the question of criminal acts, but has to do with the underlying issues of the struggle, a just struggle for national liberation by New Afrikan forces and New Afrikan people, and the responsibility of white anti-imperialists to give support to that at every level.[36]

During court proceedings on June 30, Justice Ritter mentioned that he had received a letter from Tipograph, who confirmed that she would serve as Clark's legal advisor.[37] Judith Holmes, who appeared as Balagoon's legal advisor, also stated that the court "certainly referred to us as legal advisors and has in my understanding treated us in all ways as legal

27. *Id.* at 65.

28. *Id.*

29. *Id.* at 65–66.

30. *Id.* at 66.

31. *Id.*

32. *Id.* at 66–67.

33. *Id.* at 67.

34. *Id.*

35. *See id.*

36. *Id.* at 74.

37. *See* 6/30/83 Transcript of Pretrial Proceedings ("6/30/83 Tr."), Ex. D to Sullivan Aff., at 43.

advisors." [38] Justice Ritter emphasized that they had not been appointed as attorneys and were thus not entitled to any compensation, but that they were permitted to "confer. I will permit you to do that. I will permit you to be inside the rail. You have whatever privileges the jail officials give you, and I told them to recognize your status as legal advisors. They are doing that now." [39] The court also noted that, according to the letters submitted by the legal advisors, "there is no conflict of interest in joint meetings between Mr. Balagoon, Miss Clark, Mr. Gilbert and Miss Boudin [40] ... [or] in meeting with a list of legal advisors and legal assistants" and that Clark had signed a document dated June 27, waiving any conflict of interest.[41]

Jury selection commenced on July 20. At the beginning of the day, Clark complained that she, Balagoon and Gilbert had been unsuccessful in holding legal meetings in the jail at the conclusion of the proceedings each day. Justice Ritter did "not want to take the time on this issue to have [Clark] make a statement" because potential jurors were waiting, but he encouraged her to submit all complaints in writing.[42] Clark submitted something in writing but protested her inability to make an immediate oral statement. She concluded by saying that she and her co-defendants would "not be able to be in Court tomorrow functioning unless we have a legal meeting today and unless we are assured that we can have them ... We will not be here unless that process changes." [43] Justice Ritter replied that Clark had an "absolute right under the Constitution and statutes to be physically present during all of the proceedings ... [but that] the law permits you to give up or waive that right." [44] The court advised the defendants: "If you choose not to come to Court tomorrow, that is a choice that you may make, provided that I am satisfied that it is a knowing and intelligent choice." [45]

Before continued jury selection on July 21, Justice Ritter noted the absences of defendants, who had "refused to come up to the courtroom." [46] Defendants were in holding cells and could hear the courtroom proceedings through speakers. Justice Ritter said that the defendants would be permitted to come back up if they chose, and that they would otherwise have limited opportunity to communicate with Justice Ritter by means of a microphone that would transmit sound from the cell area back up to the courtroom.[47]

Out of the presence of the jury panel, Justice Ritter addressed Clark's claim that the defendants were not accorded sufficient opportunity to consult and confer to prepare their joint defense.[48] Keith Mc-

---

**38.** *Id.*

**39.** *Id.* at 44.

**40.** Justice Ritter referred to another co-defendant, Katherine Boudin, who later pleaded guilty to one charge of second degree murder and was sentenced to twenty years to life and was paroled in September, 2003. *See* Memorandum of Law in Support of Habeas Corpus Petition ("Pet.Mem.") at 2 n. 1.

**41.** *See* 6/30/83 Tr. at 44–45.

**42.** 7/20/83 Transcript of Pretrial Proceedings, Ex. G to Sullivan Aff., at 680.

**43.** *Id.* at 683.

**44.** *Id.*

**45.** *Id.*

**46.** 7/21/83 Trial Transcript, Ex. H to Sullivan Aff., at 851.

**47.** *See id.*

**48.** *See id.* at 852.

Lean, the correctional administrator at the Orange County Jail, testified that Clark and her co-defendants did have several opportunities to meet together.[49] The court told McLean that it intended to provide defendants with the opportunity to confer privately for a minimum of two hours before and after the day's court session in the adjacent conference facility while the case was being tried.[50]

Before jury selection resumed, Justice Ritter noted that the court received a telephone call from legal advisor Judith Holmes, who reported that Clark and her co-defendants elected not to attend court proceedings that day because they had been denied their request to conduct a legal meeting the night before.[51] Justice Ritter told the defendants via microphone that they were making "an error" but they had an "absolute right to be present and to participate in the proceedings within the framework of established rules," and the court would "not force them to be physically present during this stage of the proceedings since they have voluntarily elected not to appear."[52] He noted that during jury selection the day before, none of the three had exercised any challenges, and that they consistently took no position with respect to the prosecutor's challenges to prospective jurors.[53] Justice Ritter advised the co-defendants that when they wished, they would be brought up to participate in the trial proceedings.[54] Finally, he denied Clark's request to participate in the trial proceedings via microphone from her holding cell, and limited its use to alerting the court of their desire to return to the courtroom.[55]

Several minutes later, the co-defendants returned to the courtroom.[56] Gilbert explained, "Judge Ritter, you and Mr. McLean made a record on this issue about our right to legal meetings. We objected to any proceedings going forward without us having a chance to answer that record. It's clearly an attempt to muzzle us."[57] Mentioning the waiting jury panel, Justice Ritter denied defendants' request and advised them that they would have an opportunity later in the proceedings to make a record.[58] Gilbert responded, "You talk about the delay. If you were concerned about that, all you had to do was to allow us to have a legal meeting last night and this whole mess would have been avoided. You want to get us out of the courtroom. That's your purpose."[59] Justice Ritter ruled that the defendants could not make a statement on the record. Clark stated: "You created a charade in this courtroom now," and the Judge Ritter said, "Alright. The Defendants are removed."[60]

Before voir dire continued on July 25, Balagoon complained on behalf of all three defendants that the arrangements made for them to meet in the conference room were not adequate, although he stated that the defendants had in fact conducted legal meetings on the days requested since the

---

49. *See id.* at 856, 858–59.

50. *See id.* at 857.

51. *See id.* at 860–61.

52. *Id.*

53. *See id.* at 862.

54. *See id.* at 862–63.

55. *See id.* at 865.

56. *See id.* at 869.

57. *Id.* at 870.

58. *See id.* at 869–71.

59. *Id.* at 870.

60. *Id.* at 871.

last court session.[61] Justice Ritter also entered in the court record documents provided by McLean recording the number of legal visits shared with the defendants and the number of telephone calls placed and received by the defendants listed as "legal calls." [62] Finally, legal advisor Judith Holmes sought to make a record on defendants' behalf about the legal meetings. Justice Ritter gave the following description of her role:

Miss Holmes, please listen to me. You are here as legal advisor to the defendants. You are not here as the spokesperson for the defendants. That's subject that I examined each of them about at some length, and they were all very clear in saying that they wished to speak for themselves. If you want to consult with your clients, you may do so. If you want to give them advice on what they should say, you are free to do that as well. You are not here as a spokesperson. Resume your seat.[63]

On July 26, before jury selection continued, Clark, Balagoon and Gilbert advised the court they no longer wished to remain in the courtroom.[64] The following colloquy took place between Justice Ritter and Clark:

MS. CLARK: ... For us to continue voir dire and give any legitimacy to the picking of a jury whose function is illegitimate and whose fascist implications are made more extreme by its anonymous nature would undermine our basic principles. I join in saying I

do not wish to be here anymore. And with regards to your question, do I wish to be held downstairs, no, I don't wish to be held downstairs, but I am dragged downstairs in chains when I make my wish not to be downstairs, so I have no choice but to be downstairs.

THE COURT: I will permit the defendants, at their request, to withdraw from the courtroom. They are to be held in the downstairs holding area. We will activate the microphone system. You may return when you wish to do so, provided you are willing to abide by the rules that apply to courtroom conduct. We will take a brief recess.[65]

Defendants were again removed to the holding cell with the microphone and sound system activated, and Justice Ritter stated that they could return to the courtroom when they wished.[66] Before resuming jury selection, Justice Ritter noted that the defendants had conferred with Holmes for one hour after proceedings concluded the day before, and again on that morning, and that Holmes was physically present in the courtroom that morning.[67]

None of the defendants returned to the courtroom for the continuation of voir dire on July 27 and 28, and August 1, 2, 3, and 4.[68] Their legal advisors were also absent.[69] Prior to commencement of each day's proceedings, the court noted their voluntary absence and the fact that the sound system transmitting the proceedings to their hold-

**61.** *See* 7/25/83 Transcript of Pretrial Proceedings, Ex. I to Sullivan Aff., at 1010.

**62.** *See id.* at 1018.

**63.** *Id.* at 1018–19.

**64.** *See* 7/26/83 Transcript of Pretrial Proceedings, Ex. J to Sullivan Aff., at 1245–48.

**65.** *Id.* at 1248.

**66.** *See id.* at 1248–50.

**67.** *See id.* at 1249.

**68.** *See* Transcript Excerpts, Ex. K to Sullivan Aff.

**69.** *See id.*

ing cells was activated and operating.[70] On August 8, during the final stage of jury selection, defendants appeared in court and stated that they did not wish to exercise any peremptory or cause challenges to the panel.[71]

### C. Petitioner's Trial

On August 8, 1983, the court completed jury selection. That afternoon, after the court delivered preliminary instructions to the impaneled jury, Clark and her co-defendants were to begin opening statements. Legal advisor Holmes was present in the courtroom.[72]

Balagoon began his opening remarks by discussing the historical origin of his birth name, the political history of the New Afrikan people, his involvement with assorted radical groups in acts of civil disobedience, and views about fascism in American government.[73] After the prosecutor objected twice, and the court asked Balagoon to direct his remarks to the proof that would be offered at trial, Balagoon reiterated that he did not recognize the authority of the court, and insisted that his opening remarks were intended to explain his position.[74] Balagoon stated that "if that ... can't be done, I would rather not be dealing with this Court at all, but I didn't ask for this charade." [75] Justice Ritter told Balagoon: "If you wish to tell us what you intend to prove, I will permit you to do so. If you are going to continue in the vein that you have been, then you are directed to cease that." [76] At that point Mr. Balagoon announced: "In that case, I am leav-

ing." [77] The following conversation ensued:

> MS. CLARK: We are not going to continue when you throw Mr. Balagoon out.
>
> THE COURT: By "we are not going to continue," do you mean that you wish to withdraw from the courtroom, is that what I am to understand? You are apparently packing up.
>
> MS. CLARK: Number one, I am an anti-imperialist freedom fighter. I don't recognize the legitimacy of this Court. Second of all, I am not going to continue here just as though everything was just proper when what's obvious is obvious, which is, that the truth about the question of New Afrika is not allowed to be spoken in this courtroom.[78]

Out of the presence of the jury, the court addressed the defendants as follows:

> [Y]ou have made it clear that you wish to withdraw. I will permit you to do so. As I have said at an earlier stage ... I don't consider it to be in your best interest to do so. You may be a full participant in this trial within the framework of what is legally permitted. If you withdraw, that's a choice that you may make. I will permit you to withdraw under the same circumstances as earlier in the case and if at any stage you wish to return and participate within the framework of the rules, that apply to a case of this sort, I will permit you to do that as well ... communicate your wish

---

70. *See id.*

71. *See* 8/8/83 Trial Transcript, Ex. L to Sullivan Aff., at 2786–88.

72. *See id.* at 2853.

73. *See id.* at 2853–71.

74. *See id.* at 2871.

75. *Id.*

76. *Id.* at 2872.

77. *Id.* at 2873.

78. *Id.*

to the officials who are in the holding area.[79]

After Gilbert confirmed, that he, too, wished to leave the proceedings and return to the holding cells, the court again addressed defendants:

> THE COURT: Do you understand, sir, that if you leave the courtroom, and I say this to all three of you, that during that period that you are absent the case will continue, it will go on. You will not be able to participate in those steps at trial, namely the presentation of a proper opening statement within the boundaries of what is permissible. You will not be able to participate in the examination and cross examination of witnesses in raising objections while you are out of the courtroom, and in doing any of the things that a person accused of crime is permitted to do. If you make such a choice, I repeat, I think [it's] short-sighted, but it is a choice that you may make if that's what you wish to do. Miss Clark, you wish to withdraw as well, is that correct?
>
> MS. CLARK: Yes.
>
> THE COURT: All right. All of you may withdraw. You know how to come back and under what conditions if you wish. Court stands in temporary recess.
>
> MS. CLARK: You say we may withdraw. It should be obvious that we have been forced into this court. We don't accept its legitimacy.[80]

When the jury returned to the courtroom, the court noted the absence of Clark, Balagoon and Gilbert, informed the jury that defendants had elected to "voluntarily absent themselves" from the proceedings, that it was their right to do so, and that they could hear the proceedings through the "microphone system that you see." [81]

The prosecutor made an opening statement, and commenced his direct case.[82] During the next five days of the prosecution's case, on August 9, 11, 15, 16, and 17, defendants did not participate in the trial proceedings.[83] Their legal advisors were not present in the courtroom.[84] On each of those days, the court noted for the record their voluntary absence from the proceedings, their right to return when they wished, and the activation of the microphone system.[85]

On August 22, Clark, Balagoon and Gilbert, together with Holmes, were present at the court proceedings.[86] Out of the presence of the jury, the defendants filed a motion for removal of the case "to a friendly country," as well as requests for production as defense witnesses three "New Afrikan prisoners of war" incarcerated in California, Illinois and Manhattan.[87] Noting that the prosecution would complete its direct case that very day, the court asked defendants to explain the delay in seeking to produce witnesses, but defendants only stated that they would speak to the "struggle [the Black Liberation Army] ha[s] been waging against the

---

79. *Id.* at 2874–75.

80. *Id.* at 2875–76.

81. *Id.* at 2879.

82. *See id.* at 2876.

83. *See* Transcript Excerpts, Exs. M and N to Sullivan Aff.

84. *See id.*

85. *See id.*

86. *See* 8/22/83 Trial Transcript, Ex. O to Sullivan Aff., at 3826.

87. *Id.* at 3826–30.

state."[88] Justice Ritter advised Clark and her co-defendants that he would consider their application and make a ruling later that day.[89] The defendants returned to their holding cells and did not participate in further proceedings.

On August 29, Clark, Balagoon, and Gilbert appeared in court with their legal advisor Holmes.[90] Out of the presence of the jury, defendants filed a motion seeking to be accorded "prisoner of war status" because their criminal prosecution was "an international dispute" related to "the wars of liberation."[91] Before ruling on the motion, the court noted its August 24 written decision granting the application to produce Nathaniel Burns, a/k/a Sekou Odinga, to permit defendants to call him as a witness at trial, and otherwise denying the application to produce the other two inmates from Illinois and California.[92] The court also confirmed defendants' August 25 communication that they did not seek to call additional defense witnesses.[93] The court adjourned the proceedings pending the production of Odinga from federal custody.[94]

Nearly two weeks later, on September 12, trial proceedings resumed, and Sekou Odinga testified as part of the defense case.[95] Legal advisors Holmes and Tipograph were present in the courtroom.[96] Although Clark and Gilbert confirmed their understanding that they had the right to examine Odinga, Balagoon conducted the direct examination on their behalf, asking him to describe the tenets of the New Afrikan political movement and the Black Liberation Army.[97] Clark asked Odinga only one question, about the responsibilities of white people "in relationship to the struggle that you have spoken to quite fully today."[98] At the conclusion of Odinga's testimony, defendants rested their case.[99]

Defendants did not submit requests to charge the jury. Gilbert explained on their behalf: "We consider these proceedings illegitimate. We have no interest about getting into arguments with you about how you charge the jury, as you would do in your own purposes in any case."[100]

On September 13, Clark and her co-defendants delivered separate closing arguments to the jury. Clark's summation focused almost exclusively on her political ideology. She reiterated that she viewed the Court as "a tool of imperialist rule ... not here to protect the interests of working people, but to protect the property rights in control by the rich and to repress oppressed peoples and dissidents when they rise up."[101] Clark told the jury: "The D.A. and Judge say this is a criminal case. We say the crime involved is by the

88. *Id.* at 3835–39.

89. *See id.* at 3832.

90. *See* 8/29/83 Trial Transcript, Ex. P to Sullivan Aff., at 3923.

91. *Id.* at 3923–25.

92. *See id.* at 3925–26.

93. *See id.* at 3926.

94. *See id.* at 3927–30.

95. *See* 9/12/83 Trial Transcript, Ex. Q to Sullivan Aff.

96. *See id.*

97. *See id.* at 3943, 3948, 3949–69.

98. *Id.* at 3968.

99. *See id.* at 3983.

100. *Id.* at 3985.

101. 9/13/83 Trial Transcript, Ex. R to Sullivan Aff., at 4001.

U.S. Government in denying black people their human rights and self-determination."[102] The only argument she made related to the evidence at trial was:

During this trial you saw and heard several witnesses who were from the FBI. They were clean scrubbed, soft spoken, and polite. They testified about all sorts of scientific tests they did in their laboratories in Washington. But they failed to explain why their compatriots tortured Sekou Odinga after his capture, or why they tortured Puerto Rican freedom fighter William Morales in Mexico.[103]

She ended her summation by recognizing that "[s]oon this charade they call a trial will be done" and by invoking her long term goal: "[a] society where the only privileged people will be the children whose potential and creativity make all our sacrifices worthwhile."[104] When Justice Ritter charged the jury on September 14, defendants remained in their holding cells, and none of the defendants' legal advisors were present in the courtroom.[105] Some time later, the jury returned a guilty verdict as to all defendants.

At sentencing proceedings on October 6, 1983, in the presence of legal advisors Tipograph, Holmes, and Lynne Stewart, Clark restated her commitment to their revolutionary, anti-imperialist cause for freedom and national liberation for New Afrikans and reiterated her contempt for the court's authority.[106] Shortly before Justice Ritter imposed sentence, defendants voluntarily absented themselves from the proceedings and the court acti-

vated the sound system.[107] After the court imposed sentence, the clerk of the court was instructed to advise Clark, Balagoon and Gilbert orally and in writing of their right to appeal from the judgment of conviction.[108]

### D. Petitioner's Motion to Vacate the Judgment of Conviction Pursuant to New York Criminal Procedure Law Section 440.10

On December 12, 2002, Clark filed a motion to set aside her conviction under section 440.10. The motion included an affidavit from Clark that detailed her regret for her actions, her rejection of her past life and the reasons for her delay in pursuing any legal remedy. It also contained psychologists' statements supporting the argument that Clark was not capable of taking any steps to appeal her case until many years had passed.

Clark raised three substantive arguments in support of her motion. *First*, she argued that she should not have been allowed to appear pro se, given the indications that she would act in a disruptive manner necessitating her removal from the court. *Second*, Clark asserted that even if a criminal defendant is permitted to appear pro se, a court must appoint stand-by counsel if there is a suggestion that the individual will act in a disruptive manner resulting in removal from the courtroom. *Third*, Clark argued that notwithstanding the particular developments of any criminal trial, a court should never permit a trial to continue with no one in

---

102. *Id.* at 4001–02.

103. *Id.* at 4003.

104. *Id.* at 4008.

105. *See* 9/14/83 Trial Transcript, Ex. S to Sullivan Aff., at 4115.

106. *See* 10/6/83 Transcript of Sentencing Proceedings, Ex. T to Sullivan Aff., at 21–30.

107. *See id.* at 39.

108. *See id.* at 47–48.

the courtroom to protect the defendant's interests.

Clark also made various arguments about why a motion under section 440.10 was permissible despite the long period of time that had elapsed since her conviction and sentencing. She cited *People v. Jackson*, in which the New York Court of Appeals decided that a motion under section 440.10 could potentially be filed "decades after direct appeal has been completed."[109] Clark noted that state courts have also held that the time limit that is specified in 440.10, which requires motions to be made in accordance with the normal appeal schedule, does not apply to motions based upon deprivation of the right to counsel.[110] In addition, Clark cited *People v. Silverman*,[111] arguing that under the writ of coram nobis, claims asserting deprivation of the right to counsel were still available even if an appeal had not been taken and even if the error appeared on the face of the record.

The Rockland County Court denied Clark's motion. The court upheld Justice Ritter's decision to allow Clark to appear pro se, holding that he had conducted a perfectly thorough inquiry, and that Clark's answers indicate competence to make the choice. The court found "the fact that her decision to waive her right to be present throughout her trial was voluntary" was "unassailable."[112] The court also stated that the appointment of a legal advisor was a sufficient protection of Clark's right to counsel, reasoning that "[a]lthough defendant did not have a constitutional right to proceed pro se and at the same time be represented by counsel, the trial court, in an exercise of caution and of discretion, permitted defendant to have legal advisors with whom she could consult."[113] This brief section of the opinion concluded: "All this is to convey that *were the court to consider* defendant's claim of a deprivation of her constitutional right, it would find the claim completely meritless."[114] This statement is clearly dicta.

The court then *held* that the claim could not be brought because it was procedurally defaulted:

> [The New York Criminal Procedure Law (CPL) ] § 440.10(2)(c) mandates denial of a motion to vacate when 'sufficient facts appear on the record' to permit an appellate court adequate review of the issue raised on appeal, or when such facts appear on the record, and a defendant unjustifiably fails to take an appeal or to raise such claim in an appeal actually perfected. The record herein is more than adequate to have permitted an appellate court to consider the claims raised. Nevertheless, defendant did not appeal, and now, twenty years later, she asks this court to consider these claims.[115]

The court rejected petitioner's reliance upon *People v. Silverman*, noting that the

---

**109.** 78 N.Y.2d 638, 645, 578 N.Y.S.2d 483, 585 N.E.2d 795 (1991).

**110.** *See, e.g., People v. Harris*, 109 A.D.2d 351, 491 N.Y.S.2d 678, 687 (2d Dep't 1985) ("That provision of the statute [section 440.10(3)(a) ] specifically provides that '[t]his paragraph does not apply to a motion based upon deprivation of the right to counsel at the trial.' ").

**111.** 3 N.Y.2d 200, 165 N.Y.S.2d 11, 144 N.E.2d 10 (1957).

**112.** *People of the State of N.Y. v. Judith Clark*, Ind. Nos. 81–285 & 82–6 (Sup.Ct. Rockland Co. Sept. 19, 2003) ("2003 Decision"), App. B to Pet. Mem., at 6.

**113.** *Id.* at 6–7 (citation omitted).

**114.** *Id.* at 7 (emphasis added).

**115.** *Id.*

case was decided in 1957, before the effective date of the Criminal Procedure Law, which was September 1, 1971.[116] It also rejected other cases upon which petitioner relied, viewing them as distinguishable because they dealt with claims of ineffective assistance of counsel.[117]

Finally, the court rejected Clark's explanation of the reasons justifying her delay in seeking a review of her trial and conviction.

> [D]efendant attempts to 'justify' her delay in bringing the present motion by arguing, in essence, that she was brainwashed (the court's terminology, not hers) by the members of her 'revolutionary' group into defying the entire legal system during her trial and maintained this 'revolutionary' identity until she underwent a 'transformation' in therapy and recognized the foolishness of her youth. In her fifty-four page affidavit she also outlines her good works in prison and her present remorse for her participation in the crimes of which she was convicted.[118]

The Court concluded that "[p]eer pressure followed by an alleged psychological transformation does not provide a legal ground upon which defendant can rely to justify her failure to present her present claims on an appeal, in order to meet the procedural requirements of CPL § 440.10(2)(c)."[119] The court held that Clark's motion was procedurally barred, finding it "unnecessary to reach the Peo-

ple's argument that the motion is barred by the common law doctrine of laches."[120]

Petitioner subsequently filed a motion for leave to appeal to the Appellate Division, Second Department. That motion was denied by order dated January 20, 2004, with service of notice on January 27.[121]

## III. LEGAL STANDARDS

### A. Antiterrorism and Effective Death Penalty Act of 1996

This petition is governed by section 2254 of the United States Code as it was amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[122] The AEDPA provides that a federal court may entertain an application for a writ of habeas corpus from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."[123] Section 2254 now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.[124]

---

**116.** *See id.* at 7–8.

**117.** *See id.* at 8.

**118.** *Id.* at 9.

**119.** *Id.*

**120.** *Id.* at 10.

**121.** *See The People v. Judith Clark,* Ind. No. 81–00285 (2d Dep't Jan. 20, 2004), App. A to Pet. Mem.

**122.** *See generally Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**123.** 28 U.S.C. § 2254(a).

**124.** *Id.* § 2254(d)(1).

## 1. Statute of Limitations

■■■ The AEDPA establishes a "1–year period of limitation" in connection with an application for a writ of habeas corpus "by a person in custody pursuant to the judgment of a State court."[125] When considering such an application, a court must calculate the relevant limitation period from the latest of four benchmark dates. The relevant benchmark date for petitioner's claim is "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."[126] A judgment becomes final when a petitioner fails to file a timely notice of appeal, and the appeal period expires.[127] Prisoners whose convictions became final prior to the AEDPA's effective date of April 24, 1996, had a one-year grace period in which to file their habeas corpus petitions, or until April 24, 1997.[128] The limitations period may be subject to equitable tolling,[129] but "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."[130]

In the Supreme Court's recent decision in *Day v. McDonough*, the Court addressed the nature of the AEDPA statute of limitations, finding that it is not "jurisdictional."[131] The Court compared the statute of limitations to "other affirmative defenses to habeas petitions, notably exhaustion of state remedies, procedural default, and nonretroactivity,"[132] and held that

> district courts are permitted, but not obliged, to consider, sua sponte, the timeliness of a state prisoner's habeas petition. We so hold, noting that it would make scant sense to distinguish in this regard AEDPA's time bar from other threshold constraints on federal habeas petitioners. We stress that a district court is not required to double-check the State's math. If, as this Court has held, '[d]istrict judges have no obligation to act as counsel or paralegal to pro se litigants,' then, by the same token, they surely have no obligation to assist attorneys representing the State.[133]

The Court imposed several additional constraints on district courts before they may raise the statute of limitations issue sua sponte. *First*, a district court may not "override a State's deliberate waiver of a limitations defense."[134] *Second*, "before acting on its own initiative, a court must accord the parties fair notice and an op-

---

125. *Id.* § 2244(d)(1).

126. *Id.* § 2244(d)(1)(A).

127. *See Bethea v. Girdich*, 293 F.3d 577, 578–79 (2d Cir.2002).

128. *See Ross v. Artuz*, 150 F.3d 97, 102–03 (2d Cir.1998).

129. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 n. 8, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("We have never squarely addressed the question whether equitable tolling is applicable to AEDPA's statute of limitations. Because respondent assumes that equitable tolling applies and because petitioner is not entitled to equitable tolling under any standard, we assume without deciding its applica-

tion for purposes of this case.") (citation omitted).

130. *Id.* at 418, 125 S.Ct. 1807.

131. *Day v. McDonough*, —— U.S.——, 126 S.Ct. 1675, 1681, 164 L.Ed.2d 376 (2006).

132. *Id.* at 1678.

133. *Id.* at 1684 (quoting *Pliler v. Ford*, 542 U.S. 225, 231, 124 S.Ct. 2441, 159 L.Ed.2d 338 (2004)) (citations omitted).

134. *Id.* at 1679–80 (noting that in the instant case "the federal court confronted no intelligent waiver on the State's part, only an evident miscalculation of the elapsed time").

portunity to present their positions." [135] *Third,* "the court must assure itself that the petitioner is not significantly prejudiced by the delayed focus on the limitation issue, and 'determine whether the interests of justice would be better served' by addressing the merits or by dismissing the petition as time barred." [136]

## 2. Standard of Review

■ The standard of review to be applied by a federal court to a state prisoner's habeas petition depends on whether the federal law claim was "adjudicated on the merits in State court proceedings." [137] The phrase "adjudicated on the merits" refers to a decision finally resolving the claim with res judicata effect, when the decision is based on the substance of the claim advanced, rather than on a procedural or other ground. [138] In order to determine whether the claim was decided based on the substance or another ground, Second Circuit courts consider: " '(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.' " [139]

■ If a state court adjudicated a petitioner's federal law claim on the merits, the AEDPA permits a federal court to grant a writ of habeas corpus to a state prisoner only if the state court's denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." [140] The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if: (1) the state court reaches the wrong result when presented with facts that are "materially indistinguishable from a relevant Supreme Court precedent;" or (2) the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases." [141] The "unreasonable application" prong permits a federal habeas court to grant the writ "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of petitioner's case." [142]

■ However, if a state court did not adjudicate the federal claim on the merits, "AEDPA deference is not required" and conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo. [143] The Second Circuit explained this result in *Washington v. Schriver:*

> Assuming *arguendo* that the petitioner's due process claim was not adjudicated on the merits, we apply the pre-AEDPA standard of review which accords less deference to a state court's resolution of

---

135. *Id.* at 1684.

136. *Id.* (quoting *Granberry v. Greer,* 481 U.S. 129, 136, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987)).

137. 28 U.S.C. § 2254(d).

138. *See Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001).

139. *Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003) (quoting *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001)).

140. 28 U.S.C. § 2254(d)(1).

141. *Williams,* 529 U.S. at 405, 120 S.Ct. 1495.

142. *Wiggins v. Smith,* 539 U.S. 510, 520–21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quotation marks and citations omitted).

143. *DeBerry v. Portuondo,* 403 F.3d 57, 66–67 (2d Cir.2005), *cert. denied,* ⸺ U.S. ⸺, 126 S.Ct. 225, 163 L.Ed.2d 189 (2005).

a federal constitutional issue. Prior to AEDPA, pure questions of law and mixed questions of law and fact were reviewed de novo. Under pre-AEDPA standards the factual findings of the state courts were 'presumed ... correct' absent special circumstances listed in the statute. The presumption applied to historical facts and inferences drawn from them, and to the factual findings of state appellate courts as well as trial courts.[144]

### 3. Procedural Bar

■■■■■■ A federal habeas court may not review a state prisoner's claims if the claims were defaulted in state court "pursuant to an independent and adequate state procedural rule ... unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."[145] "[C]ause," under this standard, "must be something external to the petitioner" and "'ordinarily turn[s] on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'"[146] To establish "prejudice," a "habeas petitioner must show 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."'[147]

■■■■■■ "[W]hen a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review."[148] When a state court expressly holds a claim was "not preserved for appellate review" but holds in the alternative that the claim is meritless, a federal court is barred from reviewing the claim.[149] The Second Circuit has cautioned against requiring state courts to use "specific talismanic phrases" to deny a federal claim on state procedural grounds.[150] In every case, the question is whether "'the last state court rendering a judgment in the case ... states that its judgment rests on a state procedural bar.'"[151]

■■■■■■ "[T]he adequacy of state procedural bars to the assertion of federal questions ... is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'"[152] The Second Circuit's decision in *Cotto v. Herbert* provided a roadmap for courts considering the adequacy of a state proce-

---

144. 255 F.3d 45, 55 (2d Cir.2001) (citations omitted).

145. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

146. *Id.* at 753, 111 S.Ct. 2546 (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 263, 91 L.Ed.2d 3979 (1986)) (emphasis omitted).

147. *Murray*, 477 U.S. at 494, 106 S.Ct. 2639 (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)) (emphasis omitted).

148. *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 810 (2d Cir.2000) (emphasis added).

149. *See Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir.1996).

150. *Id.*

151. *Id.* at 724 (quoting *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)).

152. *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002) (quoting *Douglas v. Alabama*, 380 U.S. 415, 422, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)).

dural default to preclude federal habeas review.[153] Courts must focus on "whether application of the procedural rule is 'firmly established and regularly followed' in the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances."[154] The Second Circuit used the following three considerations from the Supreme Court's *Lee v. Kemna* decision as "guideposts in 'evaluat[ing] the state interest in a procedural rule against the circumstances of a particular case:' "[155]

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court' decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.[156]

The Second Circuit emphasized the Supreme Court's holding that "the adequacy of a state procedural bar is determined with reference to the 'particular application' of the rule; it is not enough that the rule 'generally serves a legitimate state interest.' "[157]

"[I]n the habeas context," the doctrine of procedural default "is prudential rather than jurisdictional,"[158] and that "procedural default is normally a 'defense' that the state is 'obligated to raise' and 'preserve' if it is not to 'lose the right to assert that defense thereafter.' "[159] Therefore, in *Cotto*, the Second Circuit "assume[d] without deciding that the state bears the burden of proving the adequacy of the state procedural rule."[160]

## B. Motion to Amend a Pleading

Leave of court to amend a pleading "shall be freely given when justice so requires."[161] Whether to grant a motion to amend lies within the sound discretion of the trial court.[162] The Supreme Court has "reject[ed] the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome, and accept[ed] the principle that the purpose of the pleading is to facilitate a proper decision on the mer-

---

153. 331 F.3d 217 (2d Cir.2003).

154. *Id.* at 240 (quoting *Lee*, 534 U.S. at 376, 122 S.Ct. 877).

155. *Id.* (quoting *Lee*, 534 U.S. at 387–88, 122 S.Ct. 877). *Accord Monroe v. Kuhlman*, 433 F.3d 236, 245 (2d Cir.2006).

156. *Cotto*, 331 F.3d at 240 (quoting *Lee*, 534 U.S. at 381–85, 122 S.Ct. 877).

157. *Id.* (quoting *Lee*, 534 U.S. at 387, 122 S.Ct. 877).

158. *Id.* at 238. *Accord Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir.2000) ("The doctrine of procedural default is based on considerations of comity and finality, and not on a jurisdiction-

al limitation on the power of a federal court under 28 U.S.C. § 2254 to look beyond a state procedural default and consider the merits of a defaulted claim that asserts a constitutional violation.").

159. *Cotto*, 331 F.3d at 238 n. 9 (quoting *Trest v. Cain*, 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997)).

160. *Id.* (citing *Bennett v. Mueller*, 296 F.3d 752, 761–63 (9th Cir.2002); *Hooks v. Ward*, 184 F.3d 1206, 1216–17 (10th Cir.1999)).

161. Fed.R.Civ.P. 15(a).

162. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 70 (2d Cir. 2002).

its."[163] Like the other Federal Rules of Civil Procedure, Rule 15(a) should "be construed 'to secure the just, speedy, and inexpensive determination of every action.'"[164]

■ The Second Circuit has stated that "'considerations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend.'"[165] A proposed amendment to the pleadings is especially prejudicial when discovery has already been completed and a summary judgment motion has been filed.[166]

### C. Doctrine of Laches

"An *equitable* action is barred by laches under New York law where the following exist: (1) proof of delay in asserting a claim despite the opportunity to do so; (2) lack of knowledge on the defendant's part that a claim would be asserted; and (3) prejudice to the defendant by the allowance of the claim."[167] "[I]t is well settled that the doctrine of laches ... has no application in actions at law."[168] Therefore, New York courts have held that laches does not apply to a motion to vacate a judgment in a criminal case.[169]

### D. Sixth Amendment Right to Counsel

■ The right to counsel is explicitly safeguarded by the Sixth Amendment, which states that "in all criminal prosecutions, the accused shall enjoy the right to have the Assistance of counsel for his Defence."[170] A deprivation of the right to counsel constitutes a structural defect in the trial—it defies analysis by harmless error standards and requires automatic reversal of the conviction.[171]

■ A criminal defendant also has a Sixth Amendment right to conduct his own defense, "provided only that he know-

163. *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Foman,* 371 U.S. at 182, 83 S.Ct. 227.

164. *Foman,* 371 U.S. at 182, 83 S.Ct. 227 (quoting Fed.R.Civ.P. 1).

165. *Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71, 88 (2d Cir.1998) (quoting *Barrows v. Forest Labs.,* 742 F.2d 54, 58 (2d Cir.1984) (footnote omitted)).

166. *See id.* (citing *Ansam Assocs. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir. 1985)).

167. *Rapf v. Suffolk County of N.Y.,* 755 F.2d 282, 292 (2d Cir.1985) (*citing In re Diaz-Albertini's Estate,* 141 N.Y.S.2d 149, 154 (Sur. Ct.N.Y.Co.1955)) (emphasis added).

168. *Roth v. Black Star Publishing Co.,* 302 A.D.2d 442, 753 N.Y.S.2d 743, 744 (2d Dep't 2003) (quotation marks and citations omitted).

169. *See People v. Reed,* 273 A.D.2d 882, 709 N.Y.S.2d 764, 765 (4th Dep't 2000) (conclud-

ing that the lower court had "erred in denying defendant's motion on the ground that it was barred by the doctrine of laches" and vacating sentence of defendant, who was convicted in 1954); *People v. Kirkland,* 781 N.Y.S.2d 627 (Sup.Ct. Kings Co.2003) (conducting an in depth analysis and concluding that "[e]ven if this court is not bound by [the] *Reed* decision, it would hold that as a matter of law, laches does not apply to motions to vacate a judgment"); *People v. Bell,* 179 Misc.2d 410, 686 N.Y.S.2d 259 (Sup.Ct. N.Y.Co.1998) (refusing to dismiss a section 440.10 motion on the basis of laches although convictions occurred over twenty-three years earlier).

170. U.S. Const. amend. VI; *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding that the right to counsel applies in all critical stages of state and federal criminal proceedings).

171. *See Brecht v. Abrahamson,* 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Accord United States v. Yakobowicz,* 427 F.3d 144, 153 (2d Cir.2005).

ingly and intelligently forgoes his right to counsel and that he is able and willing to abide by the rules of procedure and courtroom protocol." [172] When a defendant expresses the desire to proceed pro se, a trial court must engage in a "full and calm" discussion with him to ensure that he fully understands his decision.[173] However, the Second Circuit has declined to mandate any particular "talismanic" procedures to this end.[174]

▆▆ In *Faretta v. California*, the leading case establishing the right of a defendant to conduct his own defense, the Supreme Court recognized that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." [175] Thus, a trial court must not permit pro se representation by defendants whose disruptive behaviors constitute an abuse of the rules or dignity of the courtroom.[176] This precept is set forth clearly in *McKaskle v. Wiggins*, where the Supreme Court held that a defendant must be "able *and willing* to abide by the rules of procedure and courtroom protocol" in order for pro se status to be properly granted.[177]

▆▆ Courts have acknowledged the tension that may arise between a defendant's right to conduct his own defense and "trial judges' concern with ensuring that criminal defendants receive adequate legal representation." [178] To address this, a court may—"even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." [179] "A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard," [180] but it does not include an abso-

---

**172.** *McKaskle*, 465 U.S. at 173, 104 S.Ct. 944.

**173.** *United States v. Hurtado*, 47 F.3d 577, 583 (2d Cir.1995).

**174.** *Id.*

**175.** 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

**176.** *See, e.g., People v. Glover*, 90 A.D.2d 776, 455 N.Y.S.2d 285, 286 (2d Dep't 1982) (upholding refusal of the trial judge to permit pro se representation after "disruptive and baseless conduct" by the defendant); *Green v. State*, 277 Ark. 129, 639 S.W.2d 512, 513 (Ark.1982) (defendant's motion to proceed pro se was denied because of his declared refusal to comply with a court rule that briefs had to be printed or typewritten); *People v. Manson*, 71 Cal.App.3d 1, 139 Cal.Rptr. 275, 302–03 (Cal.App.2d Dep't 1977) (in light of defendant's ongoing "disruptive conduct" the trial court correctly denied his repeated requests to represent himself at trial).

**177.** *McKaskle*, 465 U.S. at 173, 104 S.Ct. 944 (emphasis added).

**178.** *Johnstone v. Kelly*, 808 F.2d 214, 216 (2d Cir.1986).

**179.** *Faretta*, 422 U.S. at 834, 95 S.Ct. 2525 (citing *United States v. Dougherty*, 473 F.2d 1113, 1124–26 (D.C.Cir.1972)). *Accord Johnstone*, 808 F.2d at 216–17 ("Although the Constitution prohibits courts from requiring criminal defendants to be defended by counsel, it does not foreclose trial courts from using less overbearing means of ensuring that pro se defendants have adequate legal representation. In cases in which the trial judge fears that a pro se defendant lacks the ability to defend himself adequately, the judge can appoint counsel to assist the defendant in his pro se defense.") (citations omitted).

Although appointment of standby counsel to assist a pro se criminal defendant is a common practice, the Supreme Court has held that defendants do not have a constitutionally protected right to such a "hybrid" defense. *See McKaskle*, 465 U.S. at 183, 104 S.Ct. 944.

**180.** *McKaskle*, 465 U.S. at 174, 104 S.Ct. 944 ("The pro se defendant must be allowed to control the organization and content of his

lute bar on standby counsel's unsolicited participation in a hearing.[181]

Another common and permissible strategy is to grant pro se status at the outset of the trial and then terminate that status if defendant proves to be disruptive.[182] But upon termination of pro se status, the court must appoint counsel.[183] Similarly, if a defendant is absent from the courtroom due to an inability or unwillingness to abide by the rules of procedure and courtroom protocol, standby counsel must be appointed.[184] In one case in which a trial court did not appoint counsel in such a situation, the judgment of conviction was reversed and a new trial was ordered.[185] Although the defendant had insisted on his right to represent himself, the reviewing court found that "the [trial] court should not have allowed the defendant to continue to proceed pro se once the defendant demonstrated by his conduct that his intent was not to pursue his self-representation in good faith, but was rather to disrupt the trial proceedings." [186] After the defendant was so unruly that he was removed from the courtroom, "[t]he trial proceeded to its conclusion without the presence of either the defendant or his standby counsel in the courtroom and without any defense being presented." [187] The appellate court held that "given the early warning signs of trouble, the [trial] court should not have dismissed the defendant's standby counsel, who could have

own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial.").

**181.** *See id.* at 176, 104 S.Ct. 944.

**182.** *See Faretta,* 422 U.S. at 834, 95 S.Ct. 2525 ("[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."). The *Dougherty* decision, favorably cited by the *Faretta* Court, noted that "the right to self-representation, though asserted before trial, can be lost by disruptive behavior during trial." 473 F.2d at 1124.

**183.** *See United States v. Brock,* 159 F.3d 1077, 1079 (7th Cir.1998) (court did not abuse its discretion by revoking defendant's pro se status because defendant's conduct made it "practically impossible" for the trial to proceed; "when a defendant's obstreperous behavior is so disruptive that the trial cannot move forward, it is within the trial court's discretion to require the defendant to be represented by counsel"); *United States v. West,* 877 F.2d 281, 287 (4th Cir.1989) (court properly terminated pro se proceedings and appointed standby counsel because defendant flouted responsibility to act as officer of court by characterizing district court as "home team" on side of government); *United States v. Theriault,* 474 F.2d 359, 361 (5th Cir.1973) (standby counsel appointed and took over tri-

al when defendant was excluded from courtroom); *People v. Gloster,* 175 A.D.2d 258, 572 N.Y.S.2d 370, 373 (2d Dep't 1991) (pro se defendant forfeited right of self-representation by actions in courtroom and standby counsel properly assumed responsibility).

**184.** *See People v. Anderson,* 133 A.D.2d 120, 518 N.Y.S.2d 658 (2d Dep't 1987).

**185.** *See id.* The *only other case* found by the parties or this Court in which a court did not appoint standby counsel although the defendant was absent from the courtroom for a significant portion of the trial is *People v. Howell,* 207 A.D.2d 412, 615 N.Y.S.2d 728 (2d Dep't 1994). In that case, defendant had rejected three appointed counsel and insisted on representing himself. When he later demanded a fourth lawyer, the court refused, and offered to recall the third lawyer, to which the defendant objected. The defendant refused to return to the courtroom to participate in the case, and the case continued in his absence. The Second Department did not overturn the conviction, noting that the defendant's attempt to manipulate the process and his "continued explicit repudiation of such counsel" justified the trial court's action. *Id.* at 729.

**186.** *Anderson,* 518 N.Y.S.2d at 659.

**187.** *Id.*

taken over the defense once the defendant's conduct had forced the court's hand."[188]

■ Another way to express the same principle is to say a defendant cannot *irrevocably* waive the right to counsel at the outset of a criminal trial.[189] The Second Circuit has explained that "although a criminal defendant can waive her Sixth Amendment rights in some circumstances, that right to waiver is not absolute, since '[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'"[190]

## IV. DISCUSSION

### A. Statute of Limitations and Respondents' Motion to Amend the Answer

Clark was sentenced on October 6, 1983, and never filed a notice of appeal from the judgment of conviction. Thus, respondents could have raised the affirmative defense that the one-year grace period in which Clark was permitted to file her habeas corpus petition under the AEDPA expired on April 24, 1997. However, respondents' opposition papers, filed on May 11, 2005, never invoked the AEDPA statute of limitations. Clark's reply brief was then filed on July 14, 2005, making the petition fully submitted and ready to be decided on the merits.

■ Respondents now rely on *Day v. McDonough* to argue that this Court should either (1) act in a sua sponte capacity to dismiss the petition as time-barred, or (2) allow respondents to amend their answer to raise the statute of limitations issue. In support of the former approach, respondents note that "while this Court is not required under *Day* to do so, sua sponte dismissal of Clark's petition is entirely appropriate, because her belated petition simply cannot overcome the threshold timeliness requirement."[191] In support of the second approach, respondents note that in *Day*, the Supreme Court mentioned that the district court

---

188. *Id.*

189. The *Faretta* Court, for example, explained that one reason to appoint standby counsel was "to be available to represent the accused in the event that *termination of the defendant's self-representation is necessary.*" 422 U.S. at 834, 95 S.Ct. 2525 (emphasis added). This language is not consistent with the idea of an irrevocable waiver. In another context, the Supreme Court has noted that certain procedures

> are so fundamental to the reliability of the factfinding process that they may never be waived without irreparably 'discredit[ing] the federal courts.' *See* 21 Wright & Graham § 5039, at 207–208; *see also Wheat v. United States*, 486 U.S. 153, 162, 108 S.Ct. 1692, 1698–1699, 100 L.Ed.2d 140 (1988) (court may decline a defendant's waiver of his right to conflict-free counsel).

*Mezzanatto*, 513 U.S. at 204, 115 S.Ct. 797. This opinion also favorably quotes the following reasoning from the Seventh Circuit: "No doubt there are limits to waiver; if the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept." *Josefik*, 753 F.2d at 588.

190. *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir.1993) (quoting *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692). *See also United States v. Jones*, 381 F.3d 114, 119 (2d Cir.2004) ("The disqualification issue ... implicates not only the accused's right to counsel, but also the interests of the judiciary in preserving the integrity of its processes, and the government's interest in a fair trial and a just verdict.").

191. Memorandum of Law in Further Support of Dismissal of the Petition Based Upon the United States Supreme Court Decision in *Day v. McDonough* at 2–3.

could have "obviated th[e] controversy" by "inform[ing] the State of its obvious computation error and entertain[ing] an amendment to the State's answer." [192]

Yet respondents do not sufficiently address the Supreme Court's requirement that "the court must assure itself that the petitioner is not significantly prejudiced by the delayed focus on the limitation issue, and 'determine whether the interests of justice would be better served' by addressing the merits or by dismissing the petition as time barred." [193] I note that the second prong of this requirement incorporates a quotation from *Granberry v. Greer*, in which the Supreme Court addressed whether an appellate court could recognize a failure to exhaust defense sua sponte although respondent never raised it. The Court laid out the alternatives:

> We might treat the State's silence on the matter as a procedural default precluding the State from raising the issue on appeal. At the other extreme, we might treat non-exhaustion as an inflexible bar to consideration of the merits of the petition by the federal court, and there-

fore require that a petition be dismissed when it appears that there has been a failure to exhaust. Or, third, we might adopt an intermediate approach and direct the courts of appeals to exercise discretion in each case to decide whether the administration of justice would be better served by insisting on exhaustion or by reaching the merits of the petition forthwith.[194]

The Supreme Court adopted the middle course, as it did in *Day* within the context of the statute of limitations. In so doing, the *Granberry* Court indicated that the merits of the underlying claim were relevant when considering the interests of justice.[195]

I recognize that if the statute of limitations had been properly raised in this case, this Court would be barred from considering the merits of Clark's claim.[196] But given respondents' default and the tardiness of the motion to amend, this Court is faced with the rare situation in which the Supreme Court has ruled that the court *must* " 'determine whether the interests of justice would be better served' by address-

---

192. *Day*, 126 S.Ct. at 1683.

193. *Id.* at 1684 (quoting *Granberry*, 481 U.S. at 136, 107 S.Ct. 1671).

194. *Granberry*, 481 U.S. at 131, 107 S.Ct. 1671.

195. *See, e.g., id.* at 136, 107 S.Ct. 1671 ("In this case the Court of Appeals simply held that the nonexhaustion defense could not be waived, and made no attempt to determine whether the interests of justice would be better served by addressing the merits of the habeas petition or by requiring additional state proceedings before doing so."). *See also Krantz v. United States*, 224 F.3d 125, 126 (2d Cir.2000) ("[T]he interests of justice ordinarily require that [a defendant] not stand convicted without the resolution of the merits of an appeal.").

196. Clark raises several arguments to support the idea that the merits of her petition should be reached even it the statute of limitations is applied, but she would be unlikely to prevail on these arguments. For example, she argues that the statute should be equitably tolled due to her "mental incompetence" during the relevant period. Petitioner's Memorandum Concerning Equitable Tolling and Inapplicability of Habeas Corpus One–Year Statute of Limitations at 10. But respondents assert convincingly that petitioner's mental state cannot meet the exceptional circumstances standard for equitable tolling. They argue, for example, that "Clark's self-proclaimed 'mental disability' did not prevent her from acting as a plaintiff's representative in an unrelated federal class action lawsuit alleging unconstitutional conditions and practices at Bedford Correctional Facility." Memorandum of Law in Further Support of Dismissal of the Petition Under the AEDPA Statute of Limitations at 11.

**425**

ing the merits."[197] In considering a habeas petition in a similar posture, the Second Circuit reasoned that "[u]nlike in exhaustion cases, if we decline to reach the merits in a procedural default case, the defendant has no further recourse to either state or federal relief. Justice dictates that we act with greater leniency when determining whether to shut off a defendant's last avenue of hope."[198] In addition to constituting Clark's "last avenue of hope," her petition raises a troubling constitutional claim, which will be further explained below.[199] Given the unique facts of this case and the timing of the motion to amend, the interests of justice clearly favor considering the merits of the petition. Thus, respondents' motion to amend the answer is denied. I further decline to find, sua sponte, that the claim is time-barred.

### B. Doctrine of Laches

■ Although the state trial court found it unnecessary to reach respondents' argument that petitioner's claim should be barred by the doctrine of laches, the respondents renewed this argument in their submissions to this Court.[200] Yet the weight of authority under New York law indicates that the doctrine is unavailable in motions to vacate a criminal judgment. In fact, respondents cite only two cases related to the doctrine of laches—one is a nuisance action[201] and the other holds that "[l]aches is an equitable remedy and generally does not bar an action at law."[202]

### C. Procedural Bar

■ New York provides a mechanism for collaterally attacking a judgment that is in violation of a constitutional right—a "motion to vacate judgment" under section 440.10 of New York's Criminal Procedure Law.[203] Section 440.10(2)(c) mandates that a state court deny any motion to vacate judgment where the defendant *unjustifiably* failed to argue such constitutional violation on direct appeal despite a sufficient record.[204]

197. *Day*, 126 S.Ct. at 1684 (quoting *Granberry*, 481 U.S. at 136, 107 S.Ct. 1671).

198. *Washington v. James*, 996 F.2d 1442, 1450 (2d Cir.1993).

199. *See infra* Part IV.E.

200. *See* Memorandum of Law in Support of Response Seeking Denial of Petition for a Writ of Habeas Corpus ("Resp.Mem.") at 31 n. 8; Memorandum of Law in Further Support of Dismissal of the Petition Under the AEDPA Statute of Limitations ("Resp. SOL Mem.") at 14–15.

201. *See* Resp. SOL Mem. at 14–15 (citing *Rapf*, 755 F.2d 282).

202. *Reed*, 709 N.Y.S.2d at 765. *See also* Resp. Mem. at 31 n. 8.

203. *See* N.Y.Crim. Proc. Law § 440.10(1)(h) (McKinney 2005).

204. *See id.* § 440.10(2)(c) (emphasis added). The Criminal Procedure Law provides in pertinent part:

Notwithstanding the provisions of subdivision one, the court must deny a motion to vacate a judgment [under § 440.10] when ... c) Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal.

*Id.* A Bill introduced to the New York Assembly on May 19, 2005, contains a proposed amendment to this section, which would add the following words to the end of the language quoted above: "actually perfected by him or her unless the issue raised upon such motion is ineffective assistance of counsel." Assemb. B. 8632, 228th Leg. Sess. (N.Y. 2005).

■■ Here, the trial court found that petitioner's claim was defaulted under section 440.10(2)(c) of New York's Criminal Procedure Law because it was based on the record and was not raised on appeal.[205] In reviewing such a decision, a federal court's "task is not to determine whether that ruling was correct, but to determine its adequacy to preclude federal habeas review."[206] While some Second Circuit decisions have found that the requirements of section 440.10(2)(c) barred federal habeas review of Sixth Amendment claims,[207] the most recent decision to address this issue held that courts must focus on "whether application of the procedural rule is 'firmly established and regularly followed' *in the specific circumstances presented in the case.*"[208] The Second Circuit has not considered whether a defendant who was improperly granted pro se status and not provided with standby counsel had a "justifiable" reason for failing to raise her argument on direct appeal. In addition, the relevant Circuit cases preceded the Supreme Court's important guidance in *Lee v. Kemna.* Thus, I will analyze petitioner's claim that the state procedural default should not preclude federal review in the particular circumstances of this case

by considering each of the three "guideposts" laid out in *Lee* and *Cotto.*

### 1. Whether the Procedural Violation Actually Affected the Trial Court Ruling

The first consideration is "whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision."[209] This case is similar to *Cotto,* because the state court clearly relied on the procedural default in making the challenged decision.[210] Yet because the dicta in the court's opinion indicates that the state court would have found that petitioner's motion lacked merit, it appears that perfect compliance with the state rule would not have changed the trial court's decision. In *Cotto,* as in Clark's case, there were "indications from the trial court that it would have decided the same way even if it was unable to rely on the procedural ground."[211] Because "the likely impact of [compliance with the state procedural rule] involves a certain degree of speculation," the *Cotto* court held: "we do not think that this factor weighs as heavily in *Cotto's* favor as it did for the petitioner

205. *See* 2003 Decision at 7.

206. *Cotto,* 331 F.3d at 247.

207. *See, e.g., Aparicio,* 269 F.3d at 93 ("[T]here can be no doubt that the state court's decision on Petitioner's trial counsel claim rested on an adequate and independent state bar: Aparicio never raised ineffective assistance of trial counsel in his direct appeal. As we discussed above, New York law prohibits review of a claim on collateral review when the defendant *unjustifiably* fails to raise the claim on direct appeal.") (emphasis added) (citations omitted); *Reyes v. Keane,* 118 F.3d 136, 140 (2d Cir.1997) ("Reyes's 'unjustifiable failure' to raise the ineffective assistance of counsel claim on direct appeal ...

leads us to conclude that the same claim is barred from habeas review because Reyes cannot show cause for his failure to raise the claim at the state level.").

208. *Cotto,* 331 F.3d at 240 (quoting *Lee,* 534 U.S. at 376, 122 S.Ct. 877) (emphasis added).

209. *Id.*

210. 2003 Decision at 7.

211. *Cotto,* 331 F.3d at 242. *Accord Lee,* 534 U.S. at 381, 122 S.Ct. 877. *See* 2003 Decision at 7 ("were the court to consider defendant's claim of a deprivation of her constitutional rights, it would find the claim completely meritless").

in *Lee.*[212] Here, too, the first consideration weighs in Clark's favor, but not as heavily as if the court had not relied on the state procedural rule at all.

## 2. New York Law

The second guidepost to consider is whether state law indicates "that compliance with the rule was demanded in the specific circumstances presented."[213] "In analyzing the adequacy of the claimed procedural bar, we look to the statute and caselaw interpreting New York's statutory [procedural] rule."[214]

In this case, a close reading of relevant New York law indicates that compliance with the procedural bar was not required in Clark's particular circumstances. The plain language of section 440.10(2)(c) of the New York CPL states that a motion to vacate must be denied when "sufficient facts appear on the record" to permit an appellate court to review the issues but "no such appellate review or determination occurred owing to defendant's *unjustifiable* failure to take or perfect an appeal during the prescribed period or to his *unjustifiable* failure to raise such ground or issue upon an appeal actually perfected by him."[215]

McKinney's Practice Commentaries, which were used by the Second Circuit to interpret the CPL in *Cotto*,[216] explain this provision:

> In connection with Paragraph (c) of subdivision two, note the escape hatch regarding 'unjustifiable failure.' This implies that failure to perfect an appeal, or to have raised a point on appeal where the *nisi prius* record was sufficient could be excused, if it can be justified. Although the revisors did not supply any specific explanation of the purpose of this escape hatch, and there is no generally applicable appellate rubric construing it, consideration might be given to applying it in two situations. One would be where the ground was overlooked due to ineffective assistance of counsel.[217]

Although Clark's case does not turn on the ineffective assistance of trial counsel, the same excuse exists where defendant had *no trial counsel at all* combined with an obvious unwillingness to represent herself in accordance with court rules and procedures. As the highest court in New York explained before the passage of the CPL, the rationale for not applying the procedural bar in a right to counsel case "is not hard to discern: the Petitioner's right to appeal may be less than real if counsel is not at hand to advise him of that right or to take the necessary steps to perfect and prosecute that appeal."[218] This principle

---

212. *Cotto,* 331 F.3d at 243.

213. *Id.* at 240.

214. *Id.* at 243 (citing *Lee,* 534 U.S. at 382, 122 S.Ct. 877 ("[N]o published Missouri decision directs flawless compliance with [the state procedural rule] in the unique circumstances this case presents."). *Accord Arce v. Smith,* 889 F.2d 1271, 1273 (2d Cir.1989) (analyzing New York cases to determine whether the claim raised by the petitioner "is not regularly the subject of a procedural default in New York.").

215. N.Y.Crim. Proc. Law § 440.10(2)(c) (emphasis added).

216. *See Cotto,* 331 F.3d at 245–46, 247 n. 16, n. 17.

217. Peter Preiser, Practice Commentaries N.Y. § 440.10 at 426 (McKinney 2005).

218. *People v. Howard,* 12 N.Y.2d 65, 67, 236 N.Y.S.2d 39, 187 N.E.2d 113 (1962). I also note that section 440 "codifie[d] the common-law writ of error coram nobis." *Harris,* 491 N.Y.S.2d at 682. This writ had been available to challenge violations of the right to counsel, even decades after a conviction, and even when the error appeared on the face of the record. *See People v. Silverman,* 3 N.Y.2d 200, 200–01, 165 N.Y.S.2d 11, 144 N.E.2d 10

has direct relevance to Clark's situation—although there were various lawyers and legal advisors in her vicinity, there was no person with an ethical duty to provide counsel to Clark, during or after her trial. Given Clark's lack of counsel and her refusal to recognize the legitimacy of the court, it is not surprising that she failed to appeal. Had the court appointed standby counsel, things might have been different. Because Clark's failure to appeal was "justifiable" given the rare circumstances of her case, application of the procedural bar in section 440.10(2)(c) was not demanded.

### 3. Substantial Compliance with the Rule and Legitimate Governmental Interest

The third *Cotto* "guidepost" directs courts to consider whether petitioner "has 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest."[219] Petitioner does not claim that the section 440.10(2)(c) procedural bar is inadequate as a bar to federal habeas review in all circumstances or that the rule itself fails to protect a legitimate governmental interest. She

does assert that she substantially complied with the rule given the particular circumstances of her case and that the rule's application to bar her claim was therefore both incorrect as a matter of state law and also inadequate to bar federal habeas review.[220] I agree, and note that the governmental interests at stake in section 440.10 would not constitute legitimate interests in the particular circumstances of this case—where the procedural bar was automatically applied to prevent consideration of a section 440 motion even though petitioner's failure to appeal could be considered "justifiable" given the trial court's error in permitting her to proceed pro se when she was not "able and willing to abide by the rules of procedure and courtroom protocol."[221]

### 4. Conclusion Regarding Procedural Bar

Given the lack of representation in the courtroom during critical portions of petitioner's criminal trial, I find that the application of section 440.10(2)(c) was not demanded in these particular circumstances and is not adequate to prevent federal habeas review.[222] "At a minimum, such a

---

(1957) (reversing trial court's refusal to hear petitioner's challenge to a 1934 judgment of conviction because "[j]udicial interference with the right to counsel guaranteed to defendant by law may warrant the extraordinary remedy of coram nobis, even though the error appears on the face of the record"). The link between CPL section 440 and the writ of error coram nobis may explain why section 440's requirement that claims must be brought in accordance with the normal appeals schedule explicitly states: "This paragraph does not apply to a motion based upon deprivation of the right to counsel at the trial." N.Y.Crim. Proc. Law § 440.10(3)(a). The same link could also be relevant to the requirement under section 440.10(2)(c) that a procedural default must be "unjustifiable" in order to preclude review.

**219.** *Cotto*, 331 F.3d at 240 (quoting *Lee*, 534 U.S. at 382, 122 S.Ct. 877).

**220.** *Cf. Lee*, 534 U.S. at 382, 122 S.Ct. 877 ("'[A]lthough [the rules themselves] may not [have been] novel, ... [their] application to the facts here was.'") (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 245, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (Harlan, J., dissenting)).

**221.** *McKaskle*, 465 U.S. at 173, 104 S.Ct. 944.

**222.** *Cf. Monroe*, 433 F.3d at 245 ("Despite the first and third *Cotto* factors going against Monroe, the fact that at the time of his trial the state was not usually requiring a contemporaneous objection—the second *Cotto* factor—predominates. Therefore, Monroe's fail-

practice is not 'firmly established and regularly followed' in the circumstances presented in this case." [223]

### D. Standard of Review

 Because she filed her petition after 1996, Clark's case is governed by the federal habeas statute as amended by the AEDPA.[224] To determine whether the claim was "adjudicated on the merits," I must consider, inter alia, "whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." [225] In this case the answer to that question is very clear. The court rejected petitioner's arguments about the procedural bar and the opinion concludes with the following paragraph: "The court finds that defendant's motion is procedurally barred, and it is therefore denied in its entirety. The court further finds it unnecessary to reach the People's argument that the motion is barred by the common law doctrine of laches." [226]

Respondents argue that the deferential standard of review should nevertheless be applied because the state trial court considered the merits of Clark's constitutional claim. However, the state trial court made it clear that this brief analysis was intended to be dicta, by concluding its summary and commentary with the words, *"were the court to consider* defendant's claim of a deprivation of her constitutional rights, *it would find* the claim completely meritless." [227] The state court's verb conjugation indicates that its decision was not intended to resolve the parties' claims on the merits, but instead on procedural grounds. Second Circuit courts have been instructed to use the plain meaning of "adjudicated on the merits," [228] and that which is clearly marked as dicta has not been adjudicated on the merits.

Nor did the Appellate Division adjudicate the claim on the merits. Its entire decision and order consists of two sentences. One summarizes the procedural posture of the case, and the other says, "Upon the papers filed in support of the application and the papers filed in opposition thereto, it is ordered that the application is denied." [229] Accordingly, I will apply a de novo standard of review to Clark's Sixth Amendment claim.

### E. Sixth Amendment Right to Counsel

A review of the transcript demonstrates that Justice Ritter made many efforts to both preserve the rights of defendants and maintain the dignity of the courtroom under difficult circumstances. Yet there were two separate violations of the Sixth Amendment during Clark's trial: 1) the court should not have granted leave for Clark to represent herself; and 2) in any event, her pro se status should have been

ure to object contemporaneously is not an adequate and independent bar to our review.").

223. *Cotto,* 331 F.3d at 247.

224. *See Williams,* 529 U.S. at 402, 120 S.Ct. 1495.

225. *Sellan,* 261 F.3d at 314 (quoting *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999)).

226. 2003 Decision at 7.

227. *Id.* (emphasis added).

228. *Sellan,* 261 F.3d at 312 ("In sum, the plain meaning of § 2254(d)(1) dictates our holding: For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment.").

229. *The People v. Judith Clark,* Ind. No. 81-00285 (2d Dep't Jan. 20, 2004), App. A to Pet. Mem.

terminated when it became clear that no one would be in the courtroom to represent her interests during the presentation of the prosecution's case. Both problems constitute structural defects in Clark's trial.

■ Clark was intelligent and experienced enough to be *able* to abide by the rules of procedure and courtroom protocol under *McKaskle*, but it was clear from the initial stages of the litigation that she was not *willing* to do so. On the day her application to proceed pro se was to be considered, Clark refused to be seated and then left the courtroom without permission, saying: "We will not proceed under these conditions ... This is a freedom fight. We are freedom fighters."[230] Justice Ritter himself described the defendants' behavior as a "refusal ... to conform to the most rudimentary rules of order."[231] When he attempted to address the problem by warning defendants, "[i]f you are to remain in this courtroom, you will do so only if you agree that you will conduct yourself in a nondisruptive fashion in conformity with basic rules of decorum that apply in this courtroom," Clark showed no remorse and indeed contested that she had been disruptive at all.[232] She stated that her "purpose to be here at all was to fight for my right to represent myself because I am a freedom fighter."[233] Finally, while Justice Ritter was questioning Clark concerning her request to represent herself, she stated that "this court system and the trappings of legality that it has created around the court system are a cover for being part of the maintenance of this system and being part of protecting property and those who own and control that property."[234] Thus, Clark said she had come to believe "the only solution was revolution."[235]

In sum, Clark was forthright from the outset of the trial proceedings, stating that she did not recognize the authority of the court and refusing to abide by its rules. Justice Ritter apparently understood this refusal, as he raised the possibility that he might be "required ... by reason of [Clark's] conduct to remove [her] from the courtroom."[236] Given Clark's obvious unwillingness to abide by the rules of procedure and courtroom protocol, the Court erred in permitting her to proceed pro se.

■ Even if the decision to allow Clark to represent herself was valid, an additional constitutional error occurred when Justice Ritter failed to terminate Clark's pro se status and appoint standby counsel after her refusal to abide by courtroom protocol became undeniable. Clark's interactions with Justice Ritter were dominated by interruptions, vocal pride about her status as a "freedom fighter," and demands concerning how and when the court should proceed. She and her co-defendants openly defied court rules and left the courtroom whenever they chose. Any confusion about defendants' willingness to abide by the rules of procedure should have dissipated quickly in light of their actions.

Respondents argue that none of this behavior warrants a termination of the right to conduct one's own defense. They note

230. 6/2/83 Tr. at 9.

231. *Id.*

232. *Id.* at 26.

233. *Id.*

234. *Id.* at 61. *See also id.* at 65 ("I wish to represent myself because as a freedom fighter I am the only one who can speak for myself and I can definitely not be represented by an officer of the court.").

235. *Id.* at 62.

236. *Id.* at 65–66 (emphasis added).

that some of the cases Clark cites involve more unruly behavior than she ever exhibited.[237] While it is true that the defendants' behavior in this case could have been more disruptive, this does not change the fact that pro se representation should only be allowed if a defendant "is able and willing to abide by the rules of procedure and courtroom protocol."[238] Respondents also cite cases for the proposition that "if a defendant deliberately leaves the courtroom after his trial has begun, he forfeits his right to be present at trial, regardless of whether he knows the trial will take place in his absence."[239] But these cases are entirely distinct—there was a lawyer present to represent the defendant's interests in each of them. Here, Clark did not even have standby counsel.

Respondents also dispute this finding, arguing that "Tipograph, and later Holmes, were available at trial for legal consultation" and "[i]ndeed, Holmes appeared at the trial when petitioner elected to be present."[240] But the "legal advisors" permitted by the court were not comparable to standby counsel, as respondents imply. When Holmes tried to advocate on defendants' behalf in their absence, Justice Ritter stopped her: "Miss Holmes, please listen to me . . . You are not here as a spokesperson. Resume your seat."[241] Even if the trial had not continued when Tipograph was unavailable or when Holmes was absent, these two would not have been able to fulfill the role of a lawyer or even the more limited role of

standby counsel without the ability to speak in court.

These arguments by respondents turn out to be peripheral, however, because the core of the constitutional defect is found in one snapshot from Clark's trial. During the prosecutor's opening statement and during the government's entire direct case against defendants, which spanned at least seven trial days, *no one* was present in the courtroom to represent Clark's interests. Clark was without assistance of counsel for her defense, in clear abrogation of her Sixth Amendment right to counsel. Indeed, these facts demonstrate the very reason that Clark's waiver of her right to counsel, even if sufficient *ab initio,* could not be irrevocable—the rationale lies in the judiciary's " 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.' "[242] The proceedings at issue, with no one sitting at the defense table during the prosecution's entire case, would have appeared unfair to many people with knowledge of the constitutional right to counsel or a respect for our adversarial system of justice.

The trial judge was obligated to procure standby counsel for Clark when her inability to proceed according to court rules and protocol led to the absence of any representation at all during vital portions of her trial. If a defendant who has been granted the right to represent herself subsequently refuses to abide by courtroom

**237.** *See* Memorandum of Law in Support of Response Seeking Denial of Petition for a Writ of Habeas Corpus ("Resp.Mem.") at 41–42.

**238.** *McKaskle,* 465 U.S. at 173, 104 S.Ct. 944.

**239.** Resp. Mem. at 42–43 (citing *Taylor v. United States,* 414 U.S. 17, 19–20, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973); *Clark v. Stinson,*

214 F.3d 315, 324–25 (2d Cir.2000); *People v. Sanchez,* 65 N.Y.2d 436, 443–44, 492 N.Y.S.2d 577, 482 N.E.2d 56 (1985)).

**240.** *Id.* at 37.

**241.** 7/25/83 Tr. at 1018–19.

**242.** *Locascio,* 6 F.3d at 931 (quoting *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692).

rules and protocol, her initial waiver of the right to counsel does not cure the unfairness of what developed in this case—defendant should not be left entirely without "the Assistance of counsel for h[er] Defence." [243]

## V. CONCLUSION

For the reasons set forth above, Clark's petition is hereby granted and her conviction is reversed. The State must conduct a new trial within ninety days of this Order or release Clark from confinement. The Clerk of the Court is directed to close this case.

SO ORDERED: