**06-2261-pr**
**Davis v. Grant**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: November 14, 2007                          Decided: July 8, 2008
                                                    Amended: July 8, 2008)

Docket No. 06-2261-pr

_____

CARL DAVIS,

*Petitioner-Appellant,*

−v.−

LEROY GRANT, Warden,

*Respondent-Appellee.*


_____

Before:

KATZMANN and WESLEY, *Circuit Judges*.[1]


_____

Appeal from a judgment and order of the United States District Court for the Southern District of New York (Crotty, *J.*), dated December 22, 2005, dismissing Appellant's 28 U.S.C. § 2254 petition for a writ of habeas corpus. The district court held that the state court's determination that Appellant's Sixth Amendment rights were not violated was not an

---

[1] The Honorable Thomas J. Meskill, who was a member of this panel, passed away before oral argument. The appeal is being decided by the remaining two members of the panel, who are in agreement. *See* 2d Cir. Interim R. 0.14(b).

unreasonable application of clearly established federal law, as determined by the holdings of the Supreme Court. However, it granted Appellant a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) on that issue.

AFFIRMED.

———————

RANDA D. MAHER, Great Neck, NY, *for Petitioner-Appellant*.

ASHLYN DANNELLY, Assistant Attorney General of the State of New York (*for* Andrew M. Cuomo, Attorney General), New York, NY, *for Respondent-Appellee*.

———————

WESLEY, *Circuit Judge*:

The question before us today is: Was a New York court's holding that a *pro se* Petitioner was not deprived of his Sixth Amendment rights when he was removed from the courtroom for disruptive conduct with no standby counsel appointed to represent him in his absence "contrary to, or . . . an unreasonable application of, clearly established" Supreme Court precedent? *See* 28 U.S.C. § 2254(d)(1). In light of this Court's decisions in *Torres v. United States*, 140 F.3d 392 (2d Cir. 1998), and *Clark v. Perez*, 510 F.3d 382 (2d Cir. 2008), we must conclude that it was not.

**BACKGROUND**

Petitioner-Appellant Carl Davis appeals from a December 22, 2005 judgment and order of the United States District Court for the Southern District of New York (Crotty, *J.*) dismissing his 28 U.S.C.§ 2254 petition for a writ of habeas corpus. In his habeas petition, Davis challenged a judgment of conviction after a jury trial, entered against him on May 14, 1997 in the Supreme Court, New York County, convicting him of three counts of Assault in the Second Degree (N.Y.

Penal Law § 120.05(3)), one count of Reckless Endangerment in the First Degree (N.Y. Penal Law § 120.25), and one count of Grand Larceny in the Fourth Degree (N.Y. Penal Law § l55.30(8)).  The district court granted Davis a certificate of appealability with regard to his claim that "he was denied a fair trial and his Sixth Amendment right to confront witnesses when he was removed from the courtroom during the testimony of several of the prosecution's witnesses."

*The crime.*  Davis's convictions stem from his theft of a livery cab owned by Andres Blanco on October 18, 1995.  Blanco parked his car at a gas station on 155th Street in Manhattan, but left the keys in the ignition.  When he returned from using the station's restroom, Blanco saw a man drive away in the car.  Blanco flagged down a passing patrol car carrying police officers Alexandra Baez and Crystal Smith-Dixon, and reported the theft.  Baez, Smith-Dixon and Blanco had just begun to search for the car when Blanco received a report from a taxi dispatcher that his cab had been spotted heading north on Broadway.  Baez and Smith-Dixon headed towards Broadway and alerted police in the area.

Two officers – Ronald Kelly and William Domenech – spotted and pursued a car matching the description of the stolen cab as it sped through numerous red lights on Amsterdam Avenue, but eventually lost sight of the vehicle.  A few minutes later, Officers Bomsik Kim and Sean Harris saw the cab crash into the back of a car stopped at a red light at the intersection of Broadway and St. Nicholas Avenue.  As Kim approached the vehicle on foot, it sped off.  Officers Thomas J. Keane and Edwin Ramos joined the pursuit of the cab after hearing radio transmissions regarding its route.  As they passed 141st Street and St. Nicholas Avenue, Keane and Ramos saw the cab speeding towards them.  The cab swerved to avoid their patrol car and collided with the police car behind them – occupied by Kim and Harris.  Both Kim and Harris

suffered substantial injuries in the collision.

Following the collision, a man fled from Blanco's cab; several officers – including Thomas Smith and James Scanlon – took up the chase on foot. Smith tackled the man on the sidewalk outside of St. Nicholas Park approximately 20 to 25 feet from the scene of the accident. The man – later identified as Davis – resisted Smith's efforts to handcuff him. Smith injured his ankle in the process. Davis was ultimately subdued and detained at St. Nicholas Park until Blanco, Baez, and Smith-Dixon arrived, approximately ten minutes after Blanco first reported that his cab had been stolen.

*Pre-trial proceedings and voir dire.*[2] On February 26, 1997, just before Davis's trial was scheduled to begin in the Supreme Court, New York County (Rothwax, *J.*), his assigned attorney, Raymond Aab, informed the court that Davis wished to appear *pro se*. Aab also informed the court that, at Davis's request, he would stay on as his advisory counsel. Justice Rothwax warned Davis of the dangers of representing himself, and informed him that he was ill-advised to do so. Justice Rothwax then asked Petitioner if he understood the dangers of representing himself and if he still wished to do so; Davis answered "yes" to each question. Justice Rothwax then granted Davis's motion to proceed *pro se* and ordered Aab to remain on as his legal advisor.

Davis's trial commenced on March 3, 1997. Prior to voir dire, Davis was further warned

---

[2] Davis's first trial commenced on May 31, 1996 in the Supreme Court, New York County (Bradley, *J.*). During jury selection, Davis moved for reassignment of counsel on the grounds that counsel was ineffective for failing to file various motions and refusing to adopt Davis's proposed trial strategy. Davis's counsel acknowledged the conflict and joined the motion. While perceiving Davis's request as a delay tactic, the court nevertheless appointed a new attorney to represent Davis and declared a mistrial.

by the judge:

> I am aware Mr. Davis [that] you have not previously tried a criminal case, and I put you on notice, that you ought to be conferring with your legal advisor. If you ask questions on the voir dire that I deem to be inappropriate or improper I will stop you from asking those questions. . . . [Y]ou have no right to argue with me in front of the jury nor do you have any right to characterize my rulings. I put you on notice that if you choose to argue with me in front of the jury or if you choose to characterize my rulings **I will remove you from the courtroom**. I will not tolerate misbehavior from you during the course of this trial.

Shortly thereafter, after conferring with his legal advisor, Davis made several applications, including demands for daily transcripts of the trial proceedings and the release of personnel records of the police officers associated with his arrest. When the court denied those requests, Davis stated to the court: "That is why you hate the Appellate Division so much." After being admonished by the court for his outburst, Davis stated that he "wanted to make a motion of recusal." At that point, the first jury panel entered the courtroom.

While selecting jurors from the second panel, Davis asked the court if his legal advisor, Mr. Aab, could complete the remainder of the voir dire. The court refused, ruling that Davis could not adopt a hybrid defense. The court instructed Davis that he could either complete the voir dire, or, in the alternative, he could elect to have Aab represent him during the remainder of the trial. Davis responded that he did not want to forfeit his right to self-representation.

After jury selection was completed, the court repeatedly warned Davis that it was not in his interest to represent himself. In doing so, the court noted that, thus far, Petitioner had "repeatedly conferred with Mr. Aab" and indicated that he should continue to do so. The court also commented that, "[i]t should be clear to you by now if it w[as] not earlier, you are not capable of trying this case adequately and effectively." Davis responded that Aab had not helped

-5-

him to "build a defense" and complained that he had not had "an attorney visit." Shortly thereafter, the judge again suggested to Davis that he would be better off having Aab represent him and Davis reiterated his complaint that Aab had not prepared an adequate legal defense for him:

> Mr. Aab hasn't prepared any defense for me. He has never come to visit me, has never sent investigators out to get pictures of the scene to show — establish my defense, what I want to show. I was never arrested at the scene, I was arrested in the park, mistakenly identified. He has done nothing to investigate this, nothing whatsoever, none of the attorneys in this case have.

Aab denied Davis's claims and restated his willingness to represent Petitioner, despite disagreeing with him on an appropriate defense strategy.

*The trial.* The Prosecution called George McMillan, a paralegal in the District Attorney's office, and Officer Baez as their first two witnesses. Davis cross-examined both of these witnesses and made evidentiary objections. Davis's cross-examination of Baez was extensive and included references to prior statements made by her at a pre-trial hearing in an attempt to impeach her credibility.

Following the completion of Baez's testimony, the court denied a number of written motions by Davis. Davis again demanded that Justice Rothwax recuse himself, accusing him of "out right [sic] blatant prejudice" and "forc[ing] [him] to have counsel that has not prepared a case."

On the second day of trial, at a bench conference, Davis informed the judge that while he did not want Aab to represent him, he was "incapable" of representing himself. The court responded, "Mr. Davis, I am tired of that." Davis replied, "I will say it again. I said it." The

court retorted, "[y]ou said it today, you won't say it again." The court then noted that Davis had rejected the representation of two attorneys. Davis again reminded the court that he had rejected his prior attorney for the same reason he was rejecting Mr. Aab – "because he wanted the defense which I'm not comfortable with because it fits none of the circumstances that fit my case." When Davis continued to try to specify his reasons for rejecting counsel, the court threatened, "I'm going to remove you from the courtroom." When Petitioner asked, "[h]ow can I represent myself if you remove me," the court responded, " I don't care if you are representing yourself." When Davis persisted in attempting to specify his grounds for rejecting Aab, he was involuntarily removed from the courtroom.

Prior to the jury's return, Davis was brought back into the courtroom and seated with Aab. Just as the prosecution was about to call its next witness, Davis, in the presence of the jury, began yelling: "LADIES AND GENTLEMEN OF THE JURY . . . I DON'T BELIEVE I'M RECEIVING A FAIR TRIAL BECAUSE IN THIS COURTROOM BECAUSE THIS JUDGE IS PREJUDICE [sic]." Following this outburst, Davis was involuntarily removed from the courtroom again.

While Davis was absent, the judge informed the jury that Davis had been told "not to speak out improperly" and had been removed from the courtroom for failing to follow that instruction. Justice Rothwax cautioned the jury on allowing this misbehavior to influence its verdict and indicated he would speak with Davis outside of their presence. He told the jury: "If he assures me he will behave himself I will allow him to remain in this courtroom. If he refuses to give me that assurance, I will not allow him to remain in the courtroom." After sending the jurors to the jury room, the judge brought Davis back into the courtroom.

Upon his return, Davis reiterated his complaints about Aab and his refusal to advance Davis's desired defense of misidentification. Davis explained:

> I would like to have an attorney. Obviously, I can't represent myself. So I am entitled to an attorney who will represent me in a manner in which I would like to be represented not cause I got some farfetched idea because I wasn't in the vehicle. I would like you to recuse yourself. You have been completely prejudice [sic] to any motions I have made. They are reasonable. You won't let me put them in the record.

Davis then told the court that he "[didn't] want [Aab] next to [him]" and that he "[didn't] recognize [Aab] as anything." In response, the judge directed Aab to leave the defense table and to sit in the first row of the public seating area.

Just before the judge was going to bring the jury back in, Davis announced, "I put you on notice I'm going to prejudice the jury." When he refused to elaborate, Davis was removed from the courtroom. The trial judge then stated: "**This case will be tried without Mr. Aab and without the defendant.** Bring [the jury] in. It goes much faster that way." The jurors were informed that Davis had been removed from the courtroom and that his legal advisor was seated in the front row rather than at the defense table. The judge told the jury that Petitioner had "refused to give me the assurance I needed he would behave himself during the course of the trial. He has refused to allow Mr. Aab to act on his behalf. We will therefore be trying the case in his absence."

The prosecution then called Officer Dixon-Smith. After her direct testimony, the trial judge took a recess and advised the jury that he would determine whether Petitioner was able to return to the courtroom.

Despite giving his assurances to the court that he would behave himself, as soon as the

-8-

jury entered the courtroom, Davis started screaming racial epithets. Following this outburst, Davis was again removed from the courtroom. The court instructed the jury to disregard Davis's remarks and told Dixon-Smith that she would not be subject to cross-examination even though Aab remained in the courtroom.

In Davis's absence, the prosecution also called Officers Keane and Ramos. Each witness gave direct testimony; neither was subject to cross-examination. During their direct testimony, no one was seated at the defense table. At the conclusion of Keane's testimony, the court called a recess and brought Davis back into the courtroom.

After Davis indicated that he understood that he would be removed from the courtroom if he acted up again, he requested that Aab cross-examine the remaining prosecution witnesses and he handle other parts of the trial. The trial court denied the request and instructed Davis to either represent himself or allow Aab to try the case. The trial continued with no further disruptions.

After the prosecution presented, and Davis cross-examined, Officers Kelly and Domenech, the court indicated that it would provide Davis with transcripts of the direct examination testimony of the officers who had testified in his absence. The prosecution then called Blanco. Thereafter, Davis received the testimony of Officers Smith-Dixon, Keane, and Ramos "for his use and in the event he wishes to refer to it during his summation or with regard to cross-examination of other witnesses."

Davis moved for a mistrial on the ground that he was denied the right to confront those witnesses. The court denied the motion, stating that "[t]he situation you found yourself in was one entirely of your own making." Davis contended that the court should have supplied him with

-9-

an "audio visual system" to allow him to observe witnesses from outside the courtroom, to which the court replied that no such system was available.

Davis remained in the courtroom to cross-examine the remaining prosecution witnesses – Officers Smith, Scanlon, Harris, and Kim – again consulting with Aab, but declined to testify or call any witnesses of his own. During the pre-charge conference, Davis again moved for a mistrial on the ground that his Sixth Amendment rights had been violated; the court again denied the motion on the ground that Davis's "inability to cross-examine [witnesses] was occasioned by [his] own behavior," and that Davis therefore "forfeited, gave up, waived [his] right to cross-examine." During his summation, Davis apologized for his outbursts and explained that he had only acted that way "because at that time I felt that I was not being given a fair trial, [and] I still don't think I am." Davis further explained that he made the comments for "technical reasons," because he "felt [he] wanted to get out of [the courtroom] because of what [he] just explained."

On March 10, 1997, the jury returned a verdict convicting Davis of three counts of Assault in the Second Degree, and one count each of Reckless Endangerment in the First Degree and Grand Larceny in the Fourth Degree.

*Appellate proceedings.* On March 23, 2000, the Appellate Division, First Department affirmed Davis's conviction and held, in relevant part, that Davis "was not deprived of his rights to confrontation or counsel; he alone was responsible for the manner in which the trial was conducted."[3] *People v. Davis*, 270 A.D.2d 162, 162 (1st Dep't 2000). Davis was denied leave to

---

[3] The court also remanded for resentencing on the grounds that Davis's sentencing as a persistent violent felony offender was erroneous. *Davis*, 270 A.D.2d at 163. Following remand, Davis's sentences were modified to three terms of imprisonment of 7, 5, and 5 years, respectively, for the assault convictions, 3¼ to 7 years for reckless endangerment, and 2 to 4

-10-

appeal to the New York State Court of Appeals. *See People v. Davis*, 95 N.Y.2d 795 (2000) (Bellacosa, *J.*).

On May 23, 2001, Davis submitted a *pro se* petition for a writ of habeas corpus in the United States District Court for the Southern District of New York. He asked the court to review the same issues he raised in his state appeal, including his claim that his Sixth Amendment rights were violated when he was removed from the courtroom during prosecution witness testimony with no standby counsel appointed to represent him in his absence. In a report and recommendation dated May 6, 2005, Magistrate Judge Katz concluded that the trial court's decision was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," *see* 28 U.S.C. § 2254(d)(1), and thus that Davis was not entitled to habeas relief under the Anti-Terrorism and Effective Death Penalty Act of 1996's ("AEDPA") highly deferential standard of review. Magistrate Judge Katz explained:

> In view of (1) Petitioner's clear forfeit of his right to be present at trial through his disruptive conduct; (2) his waiver of the right to counsel and explicit statement, as he was being removed from the courtroom, that he did not want Aab to do anything; (3) the court's clear prerogative to not stop the trial or allow Petitioner to cause a mistrial through his antics and his waiver of both his right to be represented and his right to be present at trial; (4) the fact that Petitioner was permitted to return to the courtroom when he committed to conducting himself in an orderly manner; (5) Petitioner's receipt of the transcript of the testimony taken in his absence; (6) Petitioner's ability to resume participation in the trial after he returned to the courtroom, including cross-examining subsequent witnesses and delivering closing remarks to the jury; and (7) Petitioner's failure to attempt to re-call any of the witnesses who were not cross-examined, the Court cannot conclude that the Appellate Division's conclusion that Petitioner was not deprived of the rights to counsel and to confront witnesses "because he alone was responsible for the manner in which the trial was conducted," was objectively unreasonable in light of the holdings of the Supreme Court.

---

years for grand larceny.

In an order dated December 16, 2005, the district court (Crotty, *J.*) adopted the report and recommendation in full, noting that "[i]t is pellucidly clear that petitioner is the direct cause of all the constitutional errors he now claims." The district court dismissed the petition with prejudice and granted a limited certificate of appealability on the Sixth Amendment question now before us.

**DISCUSSION**

Davis argues that the state court's decision that he was not deprived of his Sixth Amendment rights when he was removed from the courtroom for disruptive conduct with no standby counsel appointed to represent him in his absence involved an unreasonable application of the Supreme Court's decisions in *Illinois v. Allen*, 397 U.S. 337 (1970), *Faretta v. California*, 422 U.S. 806 (1975), and *McKaskle v. Wiggins*, 465 U.S. 168 (1984). *See* 28 U.S.C. § 2254(d). In *Clark v. Perez*, this Court determined that a state trial court did not violate a petitioner's Sixth Amendment rights "by accepting [her] application to appear *pro se*, notwithstanding clear indications that [she] had no intention of following the trial court's rules; and by allowing the trial to continue without revoking [her] *pro se* status (or appointing stand-by counsel) after [she] refused to participate in or attend her trial." 510 F.3d at 396. After considering the Supreme Court's decisions in *Allen*, *Farreta*, and *McKaskle*, as well as our own decision in *Torres*, we explicitly declined to adopt *per se* rules that "a waiver of right to counsel is constitutionally infirm where the record indicates that the defendant was unwilling to abide by courtroom protocol" and that "a trial court must, as a constitutional matter, construe a *pro se* defendant's waiver of the right to be present at trial as invalidating her waiver of the right to counsel." *Id.* (noting that "this conclusion flows directly from *Torres*, 140 F.3d 392"). There are significant

factual differences between *Torres* and *Clark* and this case that might lead us to conclude that the trial court was constitutionally required to appoint standby counsel for Davis during his involuntary absence from the courtroom were we considering the issue de novo. But we cannot conclude that the state court decisions were unreasonable applications of Supreme Court precedent – especially in light of *Clark* and *Torres*. We note, however, that the balance between a defendant's right to self-representation and the need to "ensur[e] that evidence admitted against [him] is reliable and subject to . . . rigorous adversarial testing" is a delicate matter. *See Maryland v. Craig*, 497 U.S. 836, 846 (1990). Frankly, more guidance from the Supreme Court would be helpful.

**I**

A federal court may not grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court . . . unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Because the state court decision at issue was solely a matter of law, only the first of these standards is relevant to evaluating Davis's claim. We review a district court's denial of a writ of habeas corpus to a state prisoner de novo. *Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001).

A state court's decision is "contrary to" clearly established federal law, as expressed by the Supreme Court, if "the state court arrives at a conclusion opposite to that reached by [the]

-13-

Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003).

An "unreasonable application" of clearly established federal law occurs "if [a] state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." *Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006) (quoting *Williams*, 529 U.S. at 407-08). The inquiry for the federal habeas court is not whether the state court's application of, or refusal to extend, the governing law was erroneous, but rather whether it was "objectively unreasonable." *Williams*, 529 U.S. at 408-410. "[I]t is well-established in [this] circuit that the 'objectively unreasonable' standard . . . means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003) (internal quotation marks omitted). However, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

"[F]ederal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). Thus in *Gilchrist v. O'Keefe*, 260 F.3d 87 (2d Cir. 2001), where a state court refused to assign new counsel to a defendant who physically assaulted his court-appointed attorney:

-14-

> [W]e first noted that the Supreme Court had not spoken on the question of forfeiture of [the] right [to counsel], and, therefore, that the state court decision was not . . . contrary to a Supreme Court case that had dealt with "materially indistinguishable facts." We then recognized, however, that the Court, through its general precedents in cases such as *Gideon v. Wainwright* had established that the right to counsel is fundamental. The remaining question for the *Gilchrist* court was, therefore, whether the state court's failure to appoint new counsel was an unreasonable application of this more general precedent.

*Kennaugh*, 289 F.3d at 43 (internal citations omitted). Because the Supreme Court has neither directly considered the question of law at issue nor ruled on a case with materially indistinguishable facts, the question here is reduced to whether the state court's failure to appoint standby counsel to represent Davis when he was involuntarily removed from the courtroom for disruptive conduct was an objectively unreasonable application of, or failure to extend, a legal principle clearly established by the Supreme Court in *Allen*, *Farreta*, and *McKaskle*.

**II**

A criminal defendant has a Sixth Amendment right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also Gideon v. Wainwright*, 372 U.S. 335 (1963). "The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant – not an organ of the State interposed between an unwilling defendant and his right to defend himself personally." *Faretta*, 422 U.S. at 820. Thus, a defendant also has the right to proceed without the assistance of counsel, "provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by [the] rules of procedure and courtroom protocol." *McKaskle*, 465 U.S. at 173.

Davis argues that the clear implication of *Faretta* and *McKaskle* is that if a defendant is

*not* "able and willing to abide by . . . courtroom protocol," then he is not entitled to represent himself and must be represented by counsel. *See id.* Davis notes that, in removing him from the courtroom, Justice Rothwax implicitly held that he waived his Sixth Amendment right to confront witnesses, which required a determination that he was *unwilling* to abide by courtroom protocol. *See Allen*, 397 U.S. at 343 ("[A] defendant can lose his right to be present at trial if . . . he . . . insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."). Thus, Davis argues he forfeited his right to self-representation and, because his trial continued in the absence of replacement counsel, his Sixth Amendment rights were violated.[4]

Despite his deplorable courtroom behavior, Davis's reading of *Faretta* and *McKaskle* makes some sense. This court has made clear not only that a judge may decline a defendant's request to waive his Sixth Amendment right to counsel if the waiver is not intelligent and knowing, but that a defendant's right to counsel is violated if a judge grants a waiver that is not intelligent and knowing. *United States v. Hurtado*, 47 F.3d 577, 583 (2d Cir. 1995) ("An accused may choose to defend himself if that decision is made intelligently and knowingly, with

---

[4] Davis styles his claim as a violation of his Sixth Amendment right "to confront witnesses at trial." As Justice Cardozo wrote in *Snyder v. Massachusetts*, 291 U.S. 97 (1934), there is "[n]o doubt the privilege [of personally confronting witnesses] may be lost . . . at times even by misconduct." *Id.* at 106. It is uncontested for the purposes of this appeal that Davis was properly removed from the courtroom, and therefore that he forfeited his right to *personally* confront witnesses. *See Allen*, 397 U.S. at 343-44 ("We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant[,] . . . [including] tak[ing] him out of the courtroom until he promises to conduct himself properly."). In our view, the question at issue is whether Davis's Sixth Amendment right to have counsel confront witnesses was violated. Because this came about as a result of Davis being without counsel during his absence from the courtroom, we think the claim is more accurately styled as a denial of Davis's right to counsel.

full awareness of the right to counsel and the consequences of its waiver. Whether a waiver has occurred turns on all the surrounding facts and circumstances, including the experience, background, and conduct of the accused.") (internal quotation marks and citations omitted); *see also Faretta*, 422 U.S. at 835. But whether a defendant's waiver of his right to counsel is knowing and intelligent is only one-half of the *pro se* inquiry. Thus, the remaining question is whether *McKaskle*'s "able and willing to abide by [the] rules of procedure" criteria for a defendant's right to self-representation operate in the same way as its "knowing[] and intelligent[]" waiver criteria. *See McKaskle*, 465 U.S. at 173. In other words, can an unruly defendant – such as Davis – lose his right to proceed as his own counsel and, if so, does such a loss constitutionally require attorney representation of the recalcitrant defendant?[5] Given that the Supreme Court has made clear that courts must "indulge every reasonable presumption against [a defendant's] waiver of fundamental constitutional rights," an affirmative answer to this question finds a good deal of support in the Court's precedent. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (internal quotation marks omitted).

Indeed, the Supreme Court has explicitly approved – though not mandated – the procedure that Davis would have us declare constitutionally required.[6] In *Allen*, after removing a

---

[5] We see no grounds for distinguishing an erroneous failure to revoke already-granted *pro se* status from an erroneous grant of *pro se* status in terms of their respective Sixth Amendment implications. *See Faretta*, 422 U.S. at 834 n.46 (noting that a defendant may forfeit his right to self-representation mid-trial (*i.e.*, after it was properly granted)); *see also United States v. Dougherty*, 473 F.2d 1113, 1124 (D.C. Cir. 1972) ("The right to self-representation, though asserted before trial, can be lost by disruptive behavior during trial, constituting constructive waiver.").

[6] The American Bar Association Standards for Criminal Justice also endorses this procedure: "If a defendant who is permitted to proceed without the assistance of counsel engages in conduct which is so disruptive . . . that the trial cannot proceed in an orderly manner, the court

*pro se* defendant from the courtroom for disruptive behavior, the trial judge instructed standby counsel to represent the defendant in his absence. 397 U.S. at 340-41. In *Faretta*, the Supreme Court explicitly cabined the right to self-representation by citing *Allen* for the proposition that a "trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n.46. Indeed, the *Faretta* Court noted that "a State may – even over objection by the accused – appoint a 'standby counsel' . . . to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Id.* Thus, *Allen* and *Faretta* make clear that a judge *may* use willingness and ability to abide by courtroom protocol as prerequisites for accepting a defendant's waiver of his right to counsel, and *may* appoint standby counsel to represent a defendant who has forfeited his right to appear *pro se*. The question before us, however, is whether a judge *must* follow these procedures.

We recognize that a trial-court judge confronted with a defendant who both continues to engage in serious misconduct and insists upon his right to represent himself is placed on the horns of a serious dilemma. The judge must choose between two imperfect solutions – whether to allow the defendant to remain in the courtroom despite persistent misbehavior or to revoke the defendant's right to represent himself. Although we acknowledge the difficult position of the trial-court judge, a number of concerns favor requiring counsel to be appointed to represent a *pro se* defendant who is involuntarily removed from the courtroom. First, respect for all of a defendant's Constitutional rights, including his Fifth Amendment right to "due process of law,"

should, after appropriate warnings, revoke the permission and require representation by counsel." ABA Standards for Criminal Justice 6-3.9 (1986) (3d ed. 2000).

-18-

U.S. Const. amend. V, and his Sixth Amendment rights to an "impartial jury" and "to be confronted with the witnesses against him," *see id.* amend. VI, support the appointment of standby counsel. An absent defendant cannot present witnesses on his behalf or cross-examine prosecution witnesses. An absent defendant cannot object to inadmissible evidence. An absent defendant cannot question potential jury members, present an opening statement, or offer a summation. In short, an absent defendant can protect neither his constitutionally guaranteed trial rights nor his interest in the outcome of the proceeding. Appointing counsel to replace an absented defendant, however, goes a long way towards mitigating these concerns. *See also Mayberry v. Pennsylvania*, 400 U.S. 455, 468 (1971) (Burger, *C.J.*, concurring) (noting that the appointment of standby counsel "would at the very least blunt Sixth Amendment claims, assuming they would have merit, when the accused has refused legal assistance and then brought about his own removal from the proceedings").

Second, the government's "independent interest" in ensuring that criminal trials are fair and accurate favors the appointment of replacement counsel. *See Wheat v. United States*, 486 U.S. 153, 160 (1988). The Supreme Court has long stressed that "cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405 (1965). If no counsel is appointed to represent an absented *pro se* defendant, there is a real danger that the ensuing lack of "rigorous adversarial testing that is the norm of Anglo-American criminal proceedings," *Craig*, 497 U.S. at 846, will undermine "the accuracy of the truth-determining process" by eliminating "the trier of fact['s] . . . basis for evaluating the truth of the [testimony]," *Dutton v. Evans*, 400 U.S. 74, 89 (1970) (internal quotation marks omitted). Indeed, in its recent opinion in *Indiana v. Edwards*,

No. 07-208, 2008 WL 2445082, at *10 (June 19, 2008), the Supreme Court noted that "insofar as a defendant's lack of capacity threatens an improper conviction . . . , self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." Though the Supreme Court was specifically discussing a mentally ill *pro se* defendant in *Edwards*, the risk to the fairness and accuracy of the trial is even greater when a *pro se* defendant is *physically absent* from the proceedings. *See also Mayberry*, 400 U.S. at 468 (Burger, *C.J.*, concurring) ("A criminal trial is not a private matter; the public interest is so great that the presence and participation of counsel, even when opposed by the accused, is warranted in order to vindicate the process itself. The value of the precaution of having independent counsel, even if unwanted, is underscored by situations where the accused is removed from the courtroom under *Illinois v. Allen*.").

Third, the judiciary's interest in ensuring that criminal proceedings "appear fair to all who observe them" strongly favors the appointment of replacement counsel. *See Wheat*, 486 U.S. at 160. We are hard-pressed to think of a circumstance more likely to make an observer question the fairness of a trial than the sight of an empty defense table. Moreover, the absence of counsel will only add to a defendant's contention that the deck was stacked against him, notwithstanding the obvious connection between his own misconduct and his absence from the courtroom.

Ultimately, if we were reviewing the issue on a blank slate, we might be inclined to conclude that a defendant *must* be "able and willing to abide by rules of procedure" in order to waive his right to counsel, and thus that the Sixth Amendment requires that a defendant who is involuntarily removed from the courtroom must be provided with replacement counsel during his

absence.[7] *See McKaskle*, 465 U.S. at 173. We recognize that whenever a defendant exercises his Sixth Amendment right to self-representation, there is always some chance that the quality of his defense will suffer and that the resulting proceeding will threaten society's interests therein. *See Farretta*, 422 U.S. at 834 ("It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts."). However, when such a defendant is removed from the courtroom as a result of his disruptive conduct and the trial continues without counsel, there is almost no chance that either his rights or the government's "constitutionally essential interest in assuring that the defendant's trial is . . . fair" will be adequately protected in the resulting proceeding. *See Sell v. United States*, 539 U.S. 166, 180 (2003). The Supreme Court has recognized that "the government's interest in ensuring the integrity and efficiency of [a] trial at times outweighs [a] defendant's interest in acting as his own lawyer." *Martinez v. Ct. of App. of Cal., Fourth App. Dist.*, 528 U.S. 152, 162 (2000). We appreciate the view that the removal of the defendant from the courtroom because of his misconduct is a time when the government's interest *must* trump a defendant's right to represent himself.[8] Thus, were we empowered to do so, we might conclude that Justice Rothwax erred

---

[7] We do not mean to imply that an absented defendant who is later permitted to return to the courtroom has a renewed right to self-representation without further inquiry.

[8] Indeed, this is the same conclusion reached by a number of other courts that have considered the issue. *See United States v. Mack*, 362 F.3d 597, 601 (9th Cir. 2004) ("A defendant does not forfeit his right to representation at trial when he acts out. He merely forfeits his right to represent himself in the proceeding. . . . While we do understand that the district court had to do something about [the defendant's] obnoxious behavior, effectively leaving him without representation was still far from appropriate."); *People v. Carroll*, 189 Cal. Rptr. 327, 332 (Cal. Ct. App. 1983) ("[E]xcluding . . . a defendant representing himself was a fundamental error requiring reversal, because there was, then, no defense counsel present."); *People v. Cohn*, 160 P.3d 336, 343 (Colo. Ct. App. 2007) ("Nor can we find defendant, by his conduct, implicitly waived his right to have any counsel present at all, whether himself or someone else. Rather . . .

when he failed to appoint Aab to represent Davis during his well-earned absence from the courtroom.[9]

**III**

However, the question before us is not whether the trial judge's decision to proceed with Davis's trial in the absence of any counsel was erroneous, but whether it was an objectively unreasonable application of, or failure to extend, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). While we have recounted a number of factors that would counsel in favor of recognizing the legal principles established in *Faretta*, *Allen*, and *McKaskle* as mandating Aab's appointment in this case, other factors – including two intervening decisions of this Court –

---

the trial court could have found defendant had waived his right to proceed pro se and appointed counsel to represent defendant's interests during the time he was excluded from the courtroom."); *Saunders v. State*, 721 S.W.2d 359, 363 (Tex. Ct. App. 1985) ("Was it error of Constitutional dimension for the trial court to remove [the defendant] without expressly terminating his right of self-representation based on his disruptive behavior and directing stand-by counsel to assume the management of [the defendant's] defense? Under such facts, the court's action left [the defendant] without counsel authorized to conduct his defense. We hold that this question must be answered in the affirmative."); *see also United States v. Pina*, 844 F.2d 1, 15 (1st Cir. 1988) ("Removal of a defendant from the courtroom is more difficult when the defendant is acting *pro se.* We thus encourage a trial judge to employ his or her wisdom to appoint standby counsel whenever a defendant refuses or discharges counsel."); *Jones v. State*, 449 So. 2d 253, 257 (Fla. 1984) ("[I]t was prudent of the court to appoint standby counsel, even over defendant's objection, to observe the trial in order to be prepared, as well as possible, to represent defendant in the event it became necessary to restrict or terminate self-representation by shackling and gagging defendant or by removing him from the courtroom.").

[9] Even if we were to conclude that Justice Rothwax erred in failing to instruct Aab to represent Davis during his involuntary absence from the courtroom, we would still have to determine whether the error was subject to harmless error analysis and, if so, whether the error was harmless, before we could conclude that Davis was entitled to have his conviction overturned. *See, e.g.*, *Cohn*, 160 P.3d at 344 ("[T]o determine whether defendant's conviction should be reversed, we must determine whether the denial of his right to counsel resulting from his exclusion from the courtroom is subject to harmless error analysis. We conclude harmless error analysis is appropriate here and defendant's exclusion during jury selection cannot be considered harmless.").

-22-

demonstrate that endorsing such a mandate requires far more than a mere "extension" of those principles. As a result, regardless of whether or not we might conclude that Davis was erroneously deprived of his right to counsel when he was removed from the courtroom for disruptive conduct and no standby counsel was appointed to represent him in his absence, we cannot conclude that the result constituted an unreasonable application of Supreme Court precedent.

**A**

*Torres v. United States.* Marie Torres was a member of the Fuerzas Armada de Liberacion Nacional ("FALN"). She believed that the United States was Puerto Rico's enemy and that United States courts had no jurisdiction over those who supported Puerto Rican independence. *Torres*, 140 F.3d at 395. Torres was indicted for the 1977 bombing of the Mobil Oil Building in Manhattan, which resulted in one death and several injuries, and for which the FALN claimed responsibility. *Id.*

At her arraignment in the United States District Court for the Southern District of New York (Knapp, *J.*), Torres informed the court that she wished to represent herself during the proceedings. *Id.* at 396. She also informed the court that her defense would consist of "refus[ing] to participate in anything" that occurred in the "illegal court, illegal proceeding." *Id.* The court recognized her right to appear *pro se* over the government's objection, denied her request to be treated as a "prisoner of war," and ruled that the trial would go forward. *Id.* As promised, Torres and her legal adviser voluntarily absented themselves from the courtroom for almost all of the proceedings. *Id.* at 397. However, they could hear the proceedings through an audio connection in an adjoining room, and were free to return and participate at any time. *Id.*

Moreover, the district court appointed an "*amicus curiae*" to argue one complex statutory issue on Torres's behalf, *id.* at 397-98, and took it upon itself to explain Torres's political position to the jury at various points of the proceedings, *id.* at 398-99.

Fifteen years after Torres was convicted and sentenced, she filed a motion for post-conviction relief pursuant to 28 U.S.C. § 2255, claiming – in relevant part – that "'allowing [her] to proceed without counsel in the face of her stated intention to withdraw from the proceedings' violated her Sixth Amendment right to counsel . . . and that, therefore, the district court should have appointed counsel on her behalf." *Id.* at 401 (first two alterations in original). This Court rejected her claim:

> We recognize that a defendant's decision not to participate in the proceedings may cast doubt on whether her waiver was knowing and intelligent. But . . . [a]t least unless the defendant's action results in a non-adversarial proceeding, a court's *Faretta* inquiry should only focus on whether the defendant has the requisite capacity to understand and sufficient knowledge to make a rational choice. . . .
>
> . . . .
>
> We have concluded that Torres' decision not to participate in the proceedings did not undermine her knowing and intelligent waiver. Indeed, it is clear that she exercised her right to defend herself so that she could further her political objectives as a Puerto Rican freedom fighter.

*Id.* at 401-02 (internal quotation marks and citations omitted).

*Clark v. Perez.* Like Torres, Judith Clark was a member of a radical revolutionary group who received permission to appear *pro se* at her murder trial notwithstanding her stated intention to absent herself from the proceedings as a form of political protest.[10] *Clark*, 510 F.3d at 385-87.

---

[10] Judith Clark was a member of the Weather Underground. *Clark*, 510 F.3d at 385-86. On October 20, 1981, a group of heavily armed men – many (or all) of whom were members of the Black Liberation Army revolutionary organization – robbed an armored truck in Nyack, New

-24-

Even after being warned that her *pro se* status meant that removal from the courtroom would leave her without any legal representation, Clark voluntarily absented herself from the courtroom during the majority of the proceedings in order to protest her treatment by the court. She returned to the courtroom (with her co-defendants and her legal advisor) on only a few occasions: to seek prisoner of war status, the production of incarcerated witnesses who were "New Afrikan prisoners of war," and a change of venue "to a friendly country;" to conduct a single direct examination; and to give a closing statement emphasizing her political ideology. *Id.* at 387-89. Like Torres, she was able to listen to the proceedings over a speaker in her holding cell, and was free to return to the courtroom at any time. *Id.* at 387.

Nineteen years after Clark and her co-defendants were found guilty by the jury, Clark moved to vacate her convictions under New York Criminal Procedure Law § 440.10. *Id.* After her motion was denied on procedural grounds, Clark filed a habeas petition in the United States District Court for the Southern District of New York (Scheindlin, *J.*), claiming in relevant part that her Sixth Amendment rights were violated when her *pro se* status was not terminated "when it became clear that no one would be in the courtroom to represent her interests during the presentation of the prosecution's case." *Clark v. Perez*, 450 F. Supp. 2d 396, 429-30 (S.D.N.Y. 2006). Judge Scheindlin granted Clark's petition. *See id.* at 429-32. This Court reversed on appeal. *See Clark*, 510 F.3d at 394-97. We explained that "Clark's Sixth Amendment claim is defeated by *Torres*," *id.* at 390, and emphasized the factual similarities between the two cases –

York. In the course of the robbery and getaway, a security guard and two policemen were killed. *Id.* at 386. Clark was tried in a New York state court in Orange County (Ritter, *J.*) for her role in the robbery – primarily as the driver of one of the getaway vehicles. *Id.*

most importantly, that Clark, like Torres, "adopt[ed] a conscious strategy to use [her] trial to further [her] political objectives and to challenge the jurisdiction of the court and win political sympathy," and that the record confirmed that Clark's trial, like Torres's, "was intensely adversarial," *id.* at 397 (alterations in original). Ultimately, we concluded that

> there was no constitutional violation because Clark knowingly and intelligently waived her right to counsel, unequivocally asserted her right to self-representation, made a conscious strategic choice to waive her right to be present in the courtroom as part of a *de facto* political protest defense, and was afforded the opportunity to return whenever she chose.

*Id.* at 396.

**B**

There are a number of important differences between the facts of *Torres* and *Clark*, on the one hand, and of this case, on the other, which render the reasoning underlying our earlier decisions inapplicable here.

Most critically, unlike both Torres and Clark, Davis clearly waived his right to self-representation. *See McKaskle*, 465 U.S. at 176. In both *Torres* and *Clark*, the vast majority of the defendants' absences from trial proceedings were voluntary.[11] *See Torres*, 140 F.3d at 397; *Clark*, 510 F.3d at 387-88. Davis, on the contrary, was involuntarily removed from the courtroom for disrupting the proceedings. Whether a defendant's voluntary choice to leave a courtroom constitutes serious and obstructionist misconduct of the sort that would allow a trial judge to terminate self-representation is not as clear cut as when a defendant is removed from the courtroom because of obnoxious behavior. *See Faretta*, 422 U.S. at 834 n.46.

---

[11] Indeed, it appears that the only proceedings that went on while either Torres or Clark was involuntarily absent from the courtroom were on the second day of jury selection for Clark's trial. *See Clark*, 510 F.3d at 387.

Indeed, in both *Torres* and *Clark*, this Court suggested that the defendants had *not* waived their rights to self-representation – that is, that not only did the trial courts not violate their Sixth Amendment rights by failing to appoint counsel to represent them over their objections, but that the trial courts would have violated their Sixth Amendment rights if they *had* appointed such counsel. *See Torres*, 140 F.3d at 402 ("We have concluded that Torres' decision not to participate in the proceedings did not undermine her knowing and intelligent waiver. Indeed, it is clear that she exercised her right to defend herself . . . ."); *Clark*, 510 F.3d at 396 ("Clark knowingly and intelligently waived her right to counsel [and] unequivocally asserted her right to self-representation . . . ."). Davis, on the other hand, engaged in precisely the sort of "disruptive behavior during trial" by which a defendant can "constructive[ly] waive[]" his right to represent himself. *Dougherty*, 473 F.2d at 1124; *see also McKaskle*, 465 U.S. at 176. Thus, the primary justification for our holdings in *Torres* and *Clark* – that respect for the defendants' Sixth Amendment rights to self-representation counseled strongly against (or even barred) the trial courts from appointing counsel over their objections – does not support Justice Rothwax's failure to appoint Aab to represent Davis during his absence from the courtroom.

Moreover, the restrictions on Davis's ability to represent himself that resulted from his absence from the courtroom were more severe than those faced by Torres and Clark. Thus, Davis has a stronger claim for constructive denial of counsel than Torres or Clark did. In both *Torres* and *Clark*, the trial judges made clear that because the defendants were voluntarily absent from the courtroom, they were free to return at any time. *See Torres*, 140 F.3d at 397; *Clark*, 510 F.3d at 387-88. Davis, because he was involuntarily removed from the courtroom, was allowed to return only at the court's discretion. Indeed, at one point during Davis's trial, two witnesses –

-27-

Officers Keane and Ramos – testified and were dismissed from the stand without Justice Rothwax investigating whether Davis was able and willing to return to the courtroom. Moreover, whereas Davis did not receive transcripts of the testimony he missed until after three more witnesses – Officers Kelly and Domenech, and Blanco, the cab's owner – had testified, Torres and Clark were able to listen to the proceedings via speaker systems from an adjoining room and her cell, respectively. *See Torres*, 140 F.3d at 397; *Clark*, 510 F.3d at 387. Torres was also provided with a full transcript of the proceedings at the end of each day. *Torres*, 140 F.3d at 397.

Finally, unlike the trial judge in *Torres*, Judge Rothwax took no steps to protect the public's independent interest in the reliability of the evidence presented, and the accuracy of the legal decisions rendered, at trial – an interest usually protected by the presence of opposing counsel.[12] *See Mayberry*, 400 U.S. at 468 (Burger, *C.J.*, concurring). In *Torres*, the trial judge appointed an "*amicus curiae*" to advance Torres's position on a tricky legal issue, and even took it upon himself to advance Torres's position to the jury during sentencing. *Id.* at 397-99.

**C**

However, in light of our decisions in *Torres* and *Clark*, we cannot conclude that Judge Rothwax's failure to instruct standby counsel to represent Davis during his absence was an objectively unreasonable application of, or failure to extend, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Importantly, in *Clark*, we explicitly declined to adopt *per se* rules that "a waiver of right to counsel is constitutionally infirm where the record indicates that the defendant was unwilling to abide by courtroom protocol" and that "a trial court must, as

---

[12] As in this case, the judge in *Clark* took no such action.

a constitutional matter, construe a *pro se* defendant's waiver of the right to be present at trial as invalidating her waiver of the right to counsel." *Clark*, 510 F.3d at 396. In other words, we explicitly declined to read the Supreme Court's decisions in *Allen*, *Faretta*, and *McKaskle* as standing for the categorical proposition that Davis now presses us to endorse: that a defendant who is not willing to abide by courtroom protocol forfeits his right to self-representation.[13] Though we can distinguish Davis's claim from those of defendants in our earlier cases, its success depends on the identification and consideration of a number of variables not discussed in the Supreme Court precedent to which Davis directs our attention. As a result, we cannot conclude that our adjudication of Davis's claim relies on a mere "extension" of Supreme Court precedent, nor that Judge Rothwax's decision to the contrary was an objectively unreasonable application of that precedent.

**CONCLUSION**

That this is an area of law in need of further clarification is evident from the diametrically opposed positions taken by Davis and the government in this case. While Davis argues that his Sixth Amendment rights were violated by the trial judge's failure to appoint standby counsel to represent him during his absence from the courtroom, the government claims that respect for Davis's Sixth Amendment rights is precisely what justified the trial judge's decision *not* to make such an appointment. Specifically, the government claims that a defendant has at least three

---

[13] Though a number of courts have seemingly endorsed Davis's principle, at least on the facts of the cases before them, *see supra* note 8, at least two other courts have found no error where a *pro se* defendant was absent from the courtroom during a significant portion of the trial and no standby counsel was appointed to represent him in his absence. *See United States v. Jennings*, 855 F. Supp. 1427, 1445-46 (M.D. Pa. 1994), *aff'd*, 61 F.3d 897 (3d Cir. 1995) (unpublished table decision); *People v. Anderson*, 133 A.D.2d 120, 121 (2d Dep't 1987).

distinct rights related to self-representation under *McKaskle*: the right to appear *pro se*; the right to proceed without counsel; and the right to control one's own defense. *See McKaskle*, 465 U.S. at 187-88. Based on this understanding of *McKaskle*, the government suggests that even where a defendant has waived his right to represent himself via disruptive conduct, the trial judge should balance his remaining rights related to self-representation against any interests weighing in favor of the appointment of counsel.

We are inclined to disagree with the government. Once a defendant waives his right to represent himself, any right he has to control his own defense can be accommodated via counsel (as it is for all other represented defendants), and both the rights of the accused and the public interest strongly favor the appointment of counsel. In fact, we would not be surprised if – notwithstanding this Court's decision in *Torres* and *Clark* – the Supreme Court decided to adopt a bright line rule requiring the appointment of replacement counsel when a *pro se* defendant is absented from the courtroom. Ultimately, however, we write primarily to draw attention to this issue. We believe that the contrasting arguments of the parties in this case, as well as the divergence of thought between courts that have previously considered the issue, indicate that this is an area in which further guidance from the Supreme Court would be useful. Although we hold that the trial court's actions here did not run afoul of clearly established law as determined by the decisions of the Supreme Court, we do note that the Court's precedents demonstrate that it is both permissible and good practice for a trial court to require that appointed counsel represent a *pro se* defendant excluded from the courtroom.

One final note is in order. It goes without saying that Davis is not a strong candidate for public sympathy. One might conclude that his absence from Justice Rothwax's courtroom and

-30-

the resulting absence of an adversary to the government's case were accomplished the "old fashioned way" – Davis earned it. However, Davis's constitutional claim, while personal, has significant institutional implications in a free society committed to the rule of law. The effectiveness and legitimacy of our criminal justice system is not defined by the complainant but by those who through defiance or difficulty test the strength of our constitutional resolve.

For the foregoing reasons, the judgment of the district court is AFFIRMED.